*Cole, Whitlock & Cooper* and *Hamilton & Kirby,* for defendant in error.

---

## TRADE SECRETS.

[Circuit Court of Muskingum County.]

THE NATIONAL TUBE COMPANY v. EASTERN TUBE CO. ET AL.[*]

Decided, 1902.

*Trade Secrets—Definition of—Rule Applicable to Employes in Possession of Trade Secrets—Individuality of a Pattern or Product not a Trade Secret, When—Equity—Injunction—Damages.*

1. A trade secret is a plan or process, tool, mechanism or compound, known only to its owner and such employes as it is necessary to confide it, in order to apply it to the uses for which it is intended; when discovered in any honest manner, the person making the discovery has the right of use.

[*] Affirmed by the Supreme Court without report December 8, 1903.

2. An employe has no right to sell a trade secret evolved by his employer, nor to sell his services to another with the added value of his secret; but if the employe himself evolved the idea, the employer does not own it and can claim no further interest in it than the product of the skill, industry and intelligence of the workman.

3. Where the combined skill and experience of employes of a tube mill applied through a number of years results in a certain individuality in the construction of patterns and castings, such individuality does not amount to a trade secret from the use of which another may be enjoined.

4. But where the patterns themselves are wrongfully abstracted from the mill to which they belong for use in another mill, equity will enjoin such use.

5. An employe who effects such wrongful removal of patterns is the agent and vice principal of the company for whose benefit the patterns were wrongfully procured.

6. Jurisdiction will not be taken by a court of equity of an inquiry as to the amount of damages sustained, except where such an inquiry is incidental to other relief and for the purpose of disground for which relief was sought has vanished, jurisdiction of the cause will not be retained for the purpose of assessing damposing of the entire controversy in one court; if the principal ages.

DONAHUE, J.; DOUGLASS, J., and VOORHEES, J., concur.

Heard on appeal.

This is an action filed in this court for an injunction to restrain the defendant company from using certain patterns and machinery cast therefrom, in and about its tube works in this city. The pleadings are long, and I shall not undertake to read them, but the issue, as we understand it, is this: The plaintiff claims that, during the time of the building of this defendant company's plant, a certain Harry Nuttall was in the employ of the plaintiff company; that the mill of the plaintiff had been in operation for something like twenty years, and in the course of that operation, had perfected, through the various stages of evolution, certain patterns that were strictly individual and distinct from the patterns of all other tube mills; that the shape and construction of these patterns were a trade secret; that about the time the defendant company was building its plant, it took into its employment the said Harry Nuttall, who was

then in the employ of the plaintiff; that he was then in confidential relation, and in a position of authority with the plaintiff, and that he wrongfully, fraudulently and secretly took and carried away the patterns of the plaintiff, and had certain castings made for the use and benefit of the defendant company; that he could not have secured these patterns except by reason of his confidential employment; and plaintiff asks this court to enjoin the defendant company from the use of the castings made from these patterns; that a receiver be appointed to take charge of these castings and destroy them, and that damages may be assessed.

The defendant admits the taking and the use of patterns, the confidential relations of Nuttall, substantially as pleaded, but denies that the patterns were a trade secret and avers that these and like patterns were and are in common use; that artisans in that line of business had full knowledge of the character of the machinery and of the patterns and could easily and readily reproduce them, and that if any advantage was derived by it from the use of the patterns, it was not more than the saving of time and expense necessary to reproduce the same.

The first proposition, which must necessarily be conceded by the defendant, is that the plaintiff had a property right in these patterns, i. e., in the thing itself; whether in the idea of the thing is another proposition, but in the pattern, the article itself, plaintiff had a property right.

The second proposition that must also be conceded, is that the use by Nuttall was wrongful and in breach of his confidential relations with the plaintiff. The acceptance of employment and salary from two rival concerns at the same time is, at least, deserving of censure. "No man can serve two masters; either he will love the one and hate the other or he will hold to the one and despise the other." We take it counsel will not care to dispute the authority in support of this proposition. No man in the confidential employment of a master, or of two masters, can be permitted to take the property of one without his consent and use it for the benefit of another. That is wrongful, whether the property be a trade secret or not.

The questions here presented are important in any view we take of it. The necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world. It is absolutely necessary that it should be protected and enforced by courts, and, on the other hand, it is a serious proposition for a court to lay forcible hand by injunction upon a large concern of this character, in which hundreds of thousands of dollars are invested and a large number of men are employed, and thereby, for the time, destroy its usefulness to owners, employes and the public, and it ought not to be done if relief can be had in any other way. It should be done only when the necessities of the case demand such stringent measures.

But if these patterns are trade secrets, then it can not be permitted that the defendant company here should have the benefit of the same, or of any of the castings made from the same, when the patterns were procured in the reprehensible manner charged and admitted; but if they are not trade secrets, if the idea of these patterns is known generally to the world, or at least to the people interested in that kind and character of business, then it can not be a trade secret, and plaintiff is not entitled to any protection as to the idea.

A trade secret is a plan or process, tool, mechanism, or compound, known only to its owner and those of his employes to whom it is necessary to confide it, in order to apply it to the uses for which it is intended. It is not protected by patent, for the secret then is made public, and the inventor is protected by letters patent from infringement thereof; while, as soon as anyone fairly and honestly discovers a trade secret, either by examination of the manufactured products sold or offered for sale to the public, or in any other honest way, that person discovering it has full right to use the same. That is the risk the owner takes, and if he would have further protection, he must seek it in a patent. We believe that is the correct definition and the correct law of trade secrets, and we will not stop to cite authorities in support of it, because we believe none are necessary.

The question of defendant company's knowledge of the conduct of Nuttall is not, in the opinion of this court, of serious

concern.  He was an employe of the defendant corporation, charged with certain duties and possessed of certain powers to discharge these duties, and assisting in procuring these patterns was a part of his duties.  Therefore, he was the agent and vice principal of the defendant, and his knowledge was defendant's knowledge, though defendant actually had no knowledge whatever of the transaction, and we are free to say that we do not believe that the elective officers of this corporation, *i. e.,* the directors and the officers selected therefrom, had any knowledge whatever of the procuring of these patterns in this way or of the uses to which they were to be put; but the very fact that they had no such knowledge shows that they had delegated that power, authority and duty to Nuttall, and relying upon him, they were giving no further attention to it.  Therefore, his acts, for all the purposes of this case, are the acts and conduct of the defendant company.

If the patterns then are trade secrets, the injunction must be allowed and relief given as fully prayed for, for there is no contention but that Nuttall wrongfully used these patterns for defendant's use and benefit.

Now, what is the evidence upon this important question?  The evidence seems to fairly demonstrate the fact that these mills had a certain individuality; that this individuality was the growth of experience, the evolution, as it were, of the tools and machinery used in and about the concern.  One of the witnesses for the plaintiff—and I want to refer to one only (Mr. Bray) —has this to say (I read from page 165), being inquired of as to the several men who possessed the requisite knowledge and skill to reproduce a mill of this kind, he having said that there are such men:

"Q.   Then these mills and the construction of them is a matter of purchase in the market, and there are a number of men in this country, at this time, who can do it?  A.   It is a question of engaging a competent engineer and a man to do the work.
"Q.   The advantage of taking this pattern, you say, was a matter of several months time?  A.   Yes, sir."

Now, at another place, he says that he can make a mill, and these other men can make a mill, approximately like the Penn-

sylvania Tube Works mill. The same can be said of the bricks in the walls of the buildings of this city. Each brick is approximately like the other, but there is no brick exactly like another brick. It is not possible, in the affairs of men, to reproduce any article more than approximately like another. The word "approximately" is subject to wide differences of meaning and shades of meaning. It may be exactly alike, so far as the human senses can determine, and on the other hand it may have a difference that we can determine by the ordinary senses, and yet be substantially the same; but we think that testimony of Mr. Bray is the strongest evidence in the record that the plaintiff has offered to this court, upon which it asks us to stop a mill in which there are invested, as we have said, hundreds of thousands of dollars, and in which there are a great many men employed. The balance of the evidence is all to the same effect. That there was some care taken of these patterns and some intention of keeping them from the public generally, there can be little doubt; but a trade secret, as we said a moment ago, is a secret, known only to the owner or proprietor of it and such of his employes to whom it is necessary to communicate the secret, in order that he may use them to advantage. It does not mean that, when I employ a man who has skill, knowledge, and experience in a particular line, ask him to furnish me the knowledge, and employ him because of his knowledge and experience, and he then supplies me an article, or does for me that which his skill, knowledge, and experience enable him to do, the idea or ideas he evolves become the property of the employer as a trade secret. That is not the idea at all. The trade secret must be in the mind of the man who discovers it, and he must be using that secretly, and the communication to his employe must be made for the purpose of better enabling that employe to discharge his duties as such. Then the fact that he communicated it to that employe does not permit the employe to sell it in the market or to sell his services in the market, where he can, with the added value of that secret; but if the employe himself knew the thing, if he is the one who brought the knowledge to the employer, the only property interest that the employer can claim is the product of his skill,

the industry, and the intelligence of that workman, *i. e.*, he owns the pattern, but he does not own the idea. If he would own the idea, he must contract not only for the services of this man but that he may have the idea that shall be developed through his experiments. In other words, the natural rule of right is this: That a man shall have the benefit of all his intelligent thought and enterprise, of all that he may discover by industry and ingenuity, and unless he contracts to sell some other man that idea, he may use it for his own benefit or for the benefit of any employer he may afterward find service with.

Therefore, if these mill owners desire to cripple a man's enterprise and his energy and intelligence, to hamper him in his future employment by requiring that he shall not give to that future employer the benefit of his skill or the things that he has developed for the former master, they must contract to that effect. Nothing but a specialty would control the natural rule of right in that case.

That was not done here. These patterns, whatever they were, were the result of the combined knowledge of men in the employ of the master. It is not even contended in this case that the corporation or the men constituting the corporation had any ideas on the subject themselves, but they went into the market, where skill, knowledge, and experience were to be bought, and they bought the use, but they did not buy the brain of their employes. All they can claim then is the product of the labor of these men, and that amount to the patterns and nothing more.

To illustrate, here are draughtsmen first required, then pattern makers, then the skilled mechanics of the mill. These three working together produce a certain individuality in a certain mill. This is natural, but that individuality can be transferred to another plant to-morrow by the draughtsmen, the pattern makers and the skilled mechanics resigning their employment with this master and taking service with another. There is no question about that, under the laws of this state or under the laws of any state. Therefore, we believe that if there was an individuality in these patterns, it was not a trade secret. We believe further, that these patterns could be reproduced by a

skilled workman; that is to say, there would be no functional differences whatever. There might be a flange here or a flare there, but the idea, the central, main idea has been in use, to the common knowledge of man, for at least seventeen years, according to the evidence. So, therefore, we find that there was no trade secret here, nothing that this court could protect, as a property right, in a secret.

It is contended further, on the part of the plaintiff, that there was such confidential relation existing between the defendant, Nuttall, and the plaintiff company, at the time that he procured these patterns, that a court of equity ought to enjoin from the use and benefits of the same. We think plaintiff is right in that contention. We believe this is a violation of his plain common duty to his master, such that a court of equity ought to reach out and stop by injunction. But stop what? Why, stop the use of these patterns, not the use of the idea, because we have now held that there is no property in the idea. Harry Nuttall, by his delinquency to his master, by his fraudulent conduct, by his breach of confidential relations, gave to this defendant company the patterns for castings. He did not give to them an idea that belonged to the plaintiff. If he had, this court would not hesitate a moment to grant the injunction prayed for, and to order every one of these castings broken, because, in such event, the company must bear the loss; it acted at its own peril; but he gave to this company the use of these patterns, and when he did that, if we had been called upon to enjoin it from using them, and to enjoin him from using them, we would have done so without hesitation; but when this action was planted, the use was over, the thing was accomplished that they sought to accomplish. Therefore, while the contention of plaintiff's counsel is right as to the law, the application of it is wrong, because it goes no further than to the thing that Nuttall's wrongful conduct gave to the defendant company, and he gave them only the use of these patterns. Now that exhausts the inquiry as to the question of an injunction being granted in this case.

That there has been a wrong committed here and that plaintiff has a remedy is equally certain. On the one hand, it is con-

tended that the plaintiff should be sent out of court into another forum for that relief, and again it is urged that we should retain this case for relief, even though an injunction is not granted. We do not agree with this theory of counsel. An inquiry as to damage is the merest incident of a court of equity. It is simply because it is incidental to some other relief that a court of equity will take jurisdiction of it at all. It is because the experience of man has proven it to be better to dispose of a whole controversy in one court, if it can be done; but when the main reason for which the aid of a court of equity is sought has vanished, as we hold it has in this case, under our theory of it, there is no reason why we should retain it for the assessment of damages. The question of damages must be determined in some other forum, and with an order so that the question shall not be *res adjudicata* against this plaintiff, and so that it shall have a right to inquire as to damages in a suit at law, this petition is dismissed at the costs of the plaintiff and a motion for a new trial will be overruled, statutory time given for bill of exceptions, and thirty days for finding of facts. That will be the order and judgment of the court.

*Sullivan & Cromwell* and *Garfield, Garfield & Howe,* for plaintiff.

*F. A. Durban* and *Willis F. McCook,* for defendants.