[No. S102588. Aug. 25, 2003.]

DVD COPY CONTROL ASSOCIATION, INC., Plaintiff and Respondent, v. ANDREW BUNNER, Defendant and Appellant.

## Counsel

Richard R. Wiebe; Huber Samuelson, HS Law Group, Allonn E. Levy; First Amendment Project, James R. Wheaton, David A. Greene; Tomlinson Zisko Morosoli & Maser, Thomas E. Moore III; Electronic Frontier Foundation, Cindy A. Cohn and Robin D. Gross for Defendant and Appellant.

Howard M. Freedland and Edward J. Black for American Committee for Interoperable Systems and Computer & Communications Industry Association as Amici Curiae on behalf of Defendant and Appellant.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin and Annette L. Hurst for Institute of Electrical and Electronics Engineers, Inc.-United States Board as Amicus Curiae on behalf of Defendant and Appellant.

Jennifer Granick for Computer Professionals for Social Responsibility as Amicus Curiae on behalf of Defendant and Appellant.

Ann Beeson, Kevin S. Bankson; and Ann Brick for the American Civil Liberties Union and the American Civil Liberties Union of Northern California as Amici Curiae on behalf of Defendant and Appellant.

Jane E. Kirtley for Silha Center for the Study of Media Ethics and Law as Amicus Curiae on behalf of Defendant and Appellant.

Jennifer M. Urban and Pamela Samuelson for Intellectual Property Law Professors, the Computer & Communications Industry Association and the United States Public Policy Committee of the Association for Computing Machinery as Amici Curiae on behalf of Defendant and Appellant.

Weil, Gotshal & Manges, Jared B. Bobrow, Christopher J. Cox, Jeffrey L. Kessler, Robert G. Sugarman, Gregory S. Coleman, Edward J. Burke, Jonathan S. Shapiro, Sondra Roberto, Richard Simon, Rachel H. Laskey and John F. Greenman for Plaintiff and Respondent.

Richard A. Epstein; Thomas C. Rubin; Covington & Burling, Robert A. Long, Jr., and Anthony Hermann for Microsoft Corporation, Ford Motor Company, The Boeing Company, Sears Roebuck & Co., The Proctor & Gamble Company, AOL Time Warner, Inc., BellSouth Corporation, The Coca-Cola Company and the National Association of Manufacturers as Amici Curiae on behalf of Plaintiff and Respondent.

John K. Williamson, Ronald E. Myrick; Milbank, Tweed, Hadley & McCloy and James Pooley for the Intellectual Property Owners Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Dan Robbins, Jason M. Okai; Williams & Connolly, David E. Kendall, Thomas G. Hentoff, Janet C. Fisher, Suzanne H. Woods, Julia B. Shelton; Paul, Hastings, Janofsky & Walker; Roger M. Milgrim; John Fithian; Daniel L. Brenner, Neal M. Goldberg, Michael S. Schooler, Diane B. Burstein; David M. Proper; William Daly; and Thomas J. Ostertag for Motion Picture Association of America, Inc., American Federation of Musicians of the United States and Canada, American Federation of Television and Radio Artists, AFMA (formerly American Film Marketing Association), American Society of Composers, Authors and Publishers, American Society of Media Photographers, Inc., Association of American Publishers, Inc., Business Software Alliance, Broadcast Music, Inc., Department of Professional Employees, Directors Guild of America, Graphic Artists Guild, Interactive Digital Software Association, National Academy of Recording Arts & Sciences, Inc., National Association of Theatre Owners, National Cable & Telecommunications Association, Inc., National Football League, National Football League Properties, Inc., National Hockey League, National Music Publishers' Association, Office of the Commissioner of Baseball, Producers Guild of America, Professional Photographers of America, Recording Industry Association of America, Screen Actors Guild, Inc., Video Software Dealers Association and Writers Guild of America, West, Inc., as Amici Curiae on behalf of Plaintiff and Respondent.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Richard M. Frank, Chief Assistant Attorney General, Louis Verdugo, Jr., Assistant Attorney General, Catherine Z. Ysrael, Regina J. Brown and Emilio E. Varanini IV, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BROWN, J.**—Today we resolve an apparent conflict between California's trade secret law (Civ. Code, § 3426 et seq.)[1] and the free speech clauses of the United States and California Constitutions. ▉ In this case, a Web site operator posted trade secrets owned by another on his Internet Web site despite knowing or having reason to know that the secrets were acquired by improper means. The trial court found that the operator misappropriated these trade secrets in violation of section 3426.1 and issued a preliminary injunction pursuant to section 3426.2, subdivision (a), prohibiting the operator from disclosing these secrets. Accepting as true the trial court's findings, we now consider whether this preliminary injunction violates the First Amendment of the United States Constitution and article I, section 2, subdivision (a) of the California Constitution. We conclude it does not.

### I.

### A.

Digital versatile discs (DVD's) "are five-inch wide disks capable of storing more than 4.7 [Gigabytes] of data. In the application relevant here, they are used to hold full-length motion pictures in digital form. They are the latest technology for private home viewing of recorded motion pictures and result in drastically improved audio and visual clarity and quality of motion pictures shown on televisions or computer screens." (*Universal City Studios, Inc. v. Reimerdes* (S.D.N.Y. 2000) 111 F.Supp.2d 294, 307, fn. omitted (*Reimerdes*).)

"[T]he improved quality of a movie in a digital format brings with it the risk that a virtually perfect copy, *i.e.*, one that will not lose perceptible quality in the copying process, can be readily made at the click of a computer control and instantly distributed to countless recipients throughout the world over the Internet." (*Universal City Studios, Inc. v. Corley* (2d Cir. 2001) 273 F.3d 429, 436 (*Corley*).) Recognizing this risk of widespread piracy, the motion picture industry insisted that a viable protection system be made available to prevent users from making copies of motion pictures in digital form. Without such protection, it would not have agreed to release movies on DVD's.

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

To provide this protection, two companies, Toshiba and Matsushita Electric Industrial Co., Ltd., developed the Content Scrambling System (CSS). "CSS is an encryption scheme that employs an algorithm configured by a set of 'keys' to encrypt a DVD's contents. The algorithm is a type of mathematical formula for transforming the contents of the movie file into gibberish; the 'keys' are in actuality strings of 0's and 1's that serve as values for the mathematical formula. Decryption in the case of CSS requires a set of '[master] keys' contained in compliant DVD players, as well as an understanding of the CSS encryption algorithm. Without the [master] keys and the algorithm, a DVD player cannot access the contents of a DVD. With the [master] keys and the algorithm, a DVD player can display the movie on a television or a computer screen, but does not give a viewer the ability to use the copy function of the computer to copy the movie or to manipulate the digital content of the DVD." (*Corley, supra,* 273 F.3d at pp. 436–437.)

The motion picture, computer, and consumer electronics industries decided to use the CSS technology to encrypt copyrighted content on DVD's and agreed that this content should not be subject to unauthorized (i) copying or (ii) transmission, including making the content available over the Internet. To this end, they began licensing the technology in October 1996. Under the terms of the licensing agreement, licensees had to maintain the confidentiality of proprietary information embodied in the CSS technology, including the "master keys" and algorithms. The agreement also contained other terms and conditions designed to ensure the confidentiality of this proprietary information. These industries later established the DVD Copy Control Association, Inc. (DVD CCA), as the entity charged with granting and administering the licenses to the CSS technology.

Despite these efforts to safeguard the CSS technology, Jon Johansen, a Norwegian resident, acquired the proprietary information embodied in the technology—including the master keys and algorithms—by reverse engineering software created by a licensee, Xing Technology Corporation (Xing). Xing's software is licensed to users under a license agreement, which specifically prohibits reverse engineering. Using the proprietary information culled from this software, Johansen wrote a program called DeCSS that decrypts movies stored on DVD's and enables users to copy and distribute these movies. According to DVD CCA, DeCSS "embodies, uses, and/or is a substantial derivation of confidential proprietary information" found in the

CSS technology. Johansen posted the source code[2] of DeCSS on an Internet Web site[3] in October 1999.

Soon thereafter, DeCSS appeared on other Web sites, including a Web site maintained by Andrew Bunner. Bunner posted DeCSS on his Web site allegedly because "it would enable 'Linux' users to use and enjoy 'DVDs' available for purchase or rental in video stores" and "make 'Linux' more attractive and viable to consumers." Bunner also claimed he wanted "to ensure [that] programmers would have access to the information needed to add new features, fix existing defects and, in general, improve the '[D]eCSS' program." .

## B.

Upon discovering the posting of DeCSS on the Internet, DVD CCA and the Motion Picture Association (MPA) made extensive efforts to identify those Web sites disclosing proprietary CSS technology or linking to sites posting this information. The MPA then sent notices to these Web sites and their Internet service providers demanding that they remove this information from the sites. Despite receiving these notices, many of these Web sites refused to remove the information. DVD CCA then filed this action against Bunner and numerous other named and unnamed individuals who had published or linked to Web sites publishing DeCSS (collectively defendants), alleging trade secret misappropriation.[4]

In the complaint, DVD CCA did not seek damages. Instead, it only sought an order "enjoining and restraining [d]efendants . . . from making any further use or otherwise disclosing or distributing, on their web sites or elsewhere, or

[2] "The text of programs written in [computer programming] languages is referred to as source code. And whether directly or through the medium of another program, the sets of instructions written in programming languages—the source code—ultimately are translated into machine 'readable' strings of 1's and 0's, known in the computer world as object code, which typically are executable by the computer." (*Reimerdes, supra,* 111 F.Supp.2d at p. 306, fns. omitted; for an explanation of the more technical aspects of computers and computer software, please read Judge Kaplan's opinion in *Reimerdes, supra,* 111 F.Supp.2d 294.)

[3] As we explained in *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 265 [127 Cal.Rptr.2d 329, 58 P.3d 2], " '[t]he Internet is an international network of interconnected computers' which 'enables[] tens of millions of people to communicate with one another and to access vast amounts of information from around the world.' [Citation.] 'The best known category of communication over the Internet is the World Wide Web, which allows users to search for and retrieve information stored in remote computers, as well as, in some cases, to communicate back to designated sites. In concrete terms, the Web consists of a vast number of documents stored in different computers all over the world.' [Citation.] On the Web, 'documents commonly known as Web "pages," are . . . prevalent.' [Citation.] These pages are located at Web sites and have addresses marking their location on the Web. [Citation.]"

[4] Following the filing of this action, Bunner apparently removed DeCSS from his Web site.

'linking' to other web sites which disclose, distribute, or 'link' to any proprietary property or trade secrets relating to the CSS technology and specifically enjoining [d]efendants . . . from copying, duplicating, licensing, selling, distributing, publishing, leasing, renting or otherwise marketing the DeCSS computer program and all other products containing, using and/or substantially derived from CSS proprietary property or trade secrets . . . ."

Soon after filing the complaint, DVD CCA filed an ex parte application for a temporary restraining order (TRO). The trial court denied the request for a TRO but issued an order to show cause "why the injunction and restraints sought in [DVD CCA's] proposed preliminary injunction should not be entered against defendants . . . ."

Following a hearing and after considering written declarations submitted by the parties, the trial court issued a preliminary injunction. The injunction enjoined the named defendants, including Bunner, from "[p]osting or otherwise disclosing or distributing, on their [W]eb sites or elsewhere, the DeCSS program, the master keys or algorithms of the Content Scrambling System . . . , or any other information derived from this proprietary information." The court, however, refused to enjoin the defendants from "linking to other [Web sites] which contain the protected materials" because "such an order [would be] overbroad and extremely burdensome."

In issuing the injunction, the court concluded that DVD CCA was likely to prevail on the merits and would suffer irreparable harm without injunctive relief. First, the court concluded that the CSS technology contained protectable trade secrets because it derived independent economic value from its secrecy and because DVD CCA made reasonable efforts to maintain its secrecy. Second, the court found that Johansen had obtained these trade secrets through reverse engineering in violation of a license agreement and therefore acquired these secrets by improper means. Third, the court found that the defendants, including Bunner, knew or should have known that Johansen acquired these trade secrets by improper means when they posted DeCSS on their Web sites. Fourth, the court held that the trade secret status of the CSS technology had not been destroyed because it had been posted on the Internet. Fifth, the court concluded that DVD CCA would suffer irreparable harm without an injunction. "If the Court does not immediately enjoin the posting of this proprietary information, [DVD CCA's] right to protect this information as secret will surely be lost . . . ." The court then observed that an injunction would cause minimal harm to the defendants. Finally, the court acknowledged potential enforcement problems, but held that "a possibility or even a likelihood that an order may be disobeyed or not enforced in other jurisdictions is not a reason to deny the relief sought."

Only Bunner appealed, and the Court of Appeal reversed. Rather than review the trial court's findings in support of injunctive relief, the Court of Appeal assumed that DVD CCA was likely to prevail on the merits and would suffer irreparable harm. The court then held that the preliminary injunction, even if justified under California's trade secret law, violated the First Amendment. According to the Court of Appeal, DeCSS was "pure speech," and the injunction was an invalid prior restraint on pure speech. In reaching this conclusion, the court distinguished those cases where courts had enjoined trade secret misappropriation over a First Amendment defense because "they involved the actual use of a secret or the breach of a contractual obligation." The court also found inapplicable the many cases upholding injunctions in copyright cases against First Amendment challenges because of the differences between trade secret and copyright protection. We granted review to decide this important constitutional question.

## II.

■ California has adopted without significant change the Uniform Trade Secrets Act (UTSA). (§ 3426 et seq.; see *Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 221 [127 Cal.Rptr.2d 169, 57 P.3d 647].) Under California's version of the UTSA, a trade secret consists of "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).)

Trade secret misappropriation occurs whenever a person: (1) acquires another's trade secret with knowledge or reason to know "that the trade secret was acquired by improper means" (§ 3426.1, subd. (b)(1)); (2) discloses or uses, without consent, another's trade secret that the person "[u]sed improper means to acquire knowledge of " (*id.*, subd. (b)(2)(A)); (3) discloses or uses, without consent, another's trade secret that the person, "[a]t the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was" (a) "[d]erived from or through a person who had utilized improper means to acquire it" (*id.*, subd. (b)(2)(B)(i)), (b) "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use" (*id.*, subd. (b)(2)(B)(ii)), or (c) "[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use" (*id.*, subd. (b)(2)(B)(iii)); or (4) discloses or uses, without consent, another's trade secret when the person, "[b]efore a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake" (*id.*, subd. (b)(2)(C)).

Acquisition of a trade secret by " '[i]mproper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." (§ 3426.1, subd. (a).) "Reverse engineering or independent derivation alone," however, is not "considered improper means." (*Ibid.*)

■ California's trade secret law provides a trade secret owner with several remedies against a misappropriator, including injunctive relief. Indeed, section 3426.2, subdivision (a) expressly states that "[a]ctual or threatened misappropriation may be enjoined." Thus, California law clearly contemplates the use of injunctive relief as a remedy for trade secret misappropriation.

As relevant here, DVD CCA sought and obtained only injunctive relief against Bunner. On review, the Court of Appeal did not examine the trial court's underlying factual findings. Instead, it assumed that these findings justified "injunctive relief in the absence of any free speech concerns" under California's trade secret law. The appellate court, nonetheless, held that the injunction violated Bunner's free speech rights under the First Amendment and reversed.

Because of the unusual procedural posture of this case, we follow the lead of the Court of Appeal and assume as true the trial court findings in support of the preliminary injunction. (Cf. *Bartnicki v. Vopper* (2001) 532 U.S. 514, 524–525 [149 L.Ed.2d 787, 121 S.Ct. 1753] (*Bartnicki*) [making certain assumptions about the facts "[b]ecause of the procedural posture of" the case].) Specifically, we accept for purposes of this appeal that DVD CCA is likely to prevail on its claims that (1) the CSS technology and its master keys and algorithms are trade secrets; (2) publication of these trade secrets on the Internet has not destroyed their trade secret status; (3) publication of DeCSS discloses these trade secrets; (4) the creator of DeCSS acquired these trade secrets by improper means; and (5) Bunner knew or had reason to know that DeCSS disclosed trade secrets acquired by improper means.[5] We also assume that DVD CCA will suffer irreparable harm without injunctive relief and that the injunction will cause minimal harm to Bunner. Thus, the narrow question before us is whether the preliminary injunction violates Bunner's right to free speech under the United States and California Constitutions even though DVD CCA is likely to prevail on its trade secret claim against Bunner.

---

[5] Therefore, we need not decide whether the proprietary CSS technology is part of the public domain and no longer a protectable trade secret or whether Johansen acquired the trade secrets by improper means when he reverse engineered the Xing software in violation of a license agreement. We also decline to address Bunner's contention that the preliminary injunction violates the intellectual property clause of the United States Constitution (U.S. Const., art. I, § 8) because DVD CCA's trade secrets have been publicly disclosed and are no longer secret. We leave the resolution of these issues for the Court of Appeal on remand.

### III.

### A.

In answering this question, we must first determine whether restrictions on the dissemination of computer codes in the form of DeCSS are subject to scrutiny under the First Amendment. We conclude they are.

" '[A]ll ideas having even the slightest redeeming social importance,' including those concerning 'the advancement of truth, science, morality, and arts' have the full protection of the First Amendment." (*Junger v. Daley* (2000) 209 F.3d 481, 484 (*Junger*), quoting *Roth v. United States* (1957) 354 U.S. 476, 484 [1 L.Ed.2d 1498, 77 S.Ct. 1304].) "Even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection." (*Corley, supra,* 273 F.3d at p. 446.) "[F]or example, courts have subjected to First Amendment scrutiny restrictions on the dissemination of technical scientific information, [citation] and scientific research, [citation] and attempts to regulate the publication of instructions [citation]." (*Id.* at p. 447, fn. omitted.)

As such, "[i]t cannot seriously be argued that any form of computer code may be regulated without reference to First Amendment doctrine." (*Reimerdes, supra,* 111 F.Supp.2d at p. 326.) "A computer program states or represents a procedure or algorithm in a programming language. The same algorithm could be written in a natural language like English or a programming language like C or LISP, but it remains the same algorithm." (Tien, *Publishing Software as a Speech Act* (2000) 15 Berkeley Tech. L.J. 629, 633, fn. omitted.) Of course, "[n]ot everyone can understand each of these forms. Only English speakers will understand English formulations. Principally those familiar with the particular programming language will understand the source code expression. And only a relatively small number of skilled programmers and computer scientists will understand the machine readable object code. But each form expresses the same idea, albeit in different ways." (*Reimerdes,* at p. 326, fn. omitted.) Moreover, "the fact that a program has the capacity to direct the functioning of a computer does not mean that it lacks the additional capacity to convey information . . . ." (*Corley, supra,* 273 F.3d at p. 447.) Because computer code "is an expressive means for the exchange of information and ideas about computer programming" (*Junger, supra,* 209 F.3d at p. 485), "we join the other courts that have concluded that computer code, and computer programs constructed from code can merit First Amendment protection" (*Corley,* at p. 449; see also *Junger,* at p. 485; *United States v. Elcom Ltd.* (N.D.Cal. 2002) 203 F.Supp.2d 1111, 1126–1127; *Reimerdes,* at p. 327.)

## B.

 "As computer code . . . is a means of expressing ideas, the First Amendment must be considered before its dissemination may be prohibited or regulated . . . . But that conclusion still leaves for determination the level of scrutiny to be applied in determining the constitutionality of" an injunction prohibiting the dissemination of computer code.[6] (*Reimerdes, supra,* 111 F.Supp.2d at p. 327.) In determining the appropriate level of scrutiny, the critical question is whether the injunction is content neutral or content based. (See *Madsen v. Women's Health Center* (1994) 512 U.S. 753, 762–764 (*Madsen*); *Los Angeles Alliance for Survival v. Los Angeles* (2000) 22 Cal.4th 352, 364–365 [93 Cal.Rptr.2d 1, 993 P.2d 334] (*Los Angeles Alliance*).) Content-based injunctions are subject to "the level of heightened scrutiny set forth in *Perry Ed. Assn.* [*v. Perry Local Educators Assn.* (1983)] 460 U.S. [37,] 45." (*Madsen,* at pp. 763–764.) By contrast, content-neutral injunctions are subject to the lesser level of scrutiny set forth in *Madsen, supra,* 512 U.S. at page 765. In this case, we conclude that the preliminary injunction issued by the trial court is content neutral and should be reviewed under the standard articulated in *Madsen.* (See *Planned Parenthood Shasta-Diablo, Inc. v. Williams* (1995) 10 Cal.4th 1009, 1023–1025 [43 Cal.Rptr.2d 88, 898 P.2d 402] (*Planned Parenthood II*) [reviewing a content-neutral injunction under the *Madsen* test].)

 "Our principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.' " (*Madsen, supra,* 512 U.S. at p. 763, quoting *Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791 [105 L.Ed.2d 661, 109 S.Ct. 2746].) "[L]iteral or absolute content neutrality" is not necessary. (*Los Angeles Alliance, supra,* 22 Cal.4th at p. 368.) "The government's purpose is the controlling consideration," and a governmental regulation of speech is only content based if the government adopted the regulation "because of disagreement with the message it conveys." (*Ward,* at p. 791.) This is true for "speech cases generally . . . ." (*Ibid.*) Thus, an injunction "that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (*Ibid.*) However, injunctions "that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." (*Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 643 [129 L.Ed.2d 497, 114 S.Ct. 2445].)

Applying this standard, we conclude that the preliminary injunction at issue here is content neutral. The underlying basis for the injunction is the trial court's holding that Bunner misappropriated DVD CCA's property—its

---

[6] Bunner does not challenge the constitutionality of California's trade secret statutes.

trade secrets—in violation of California's trade secret law. (See *Ruckelshaus v. Monsanto Co.* (1984) 467 U.S. 986, 1003–1004 [81 L.Ed.2d 815, 104 S.Ct. 2862] (*Monsanto*) [holding that trade secrets are a "property right . . . protected by the Taking Clause of the Fifth Amendment"].) In issuing the injunction, the court therefore relied on the fact that DVD CCA made reasonable efforts to keep the information secret (§ 3426.1, subd. (d)(2)), and that DVD CCA received a "competitive advantage over others . . . by virtue of its exclusive access to the" information (*Monsanto*, at p. 1012). Thus, the injunction singled out Bunner's communications because of DVD CCA's efforts to maintain the secrecy of the CSS technology and the competitive advantage it enjoyed from those efforts—and not because of the communications' subject matter or any disagreement with Bunner's message or viewpoint. In other words, the trial court issued the injunction to protect DVD CCA's statutorily created property interest in information—and not to suppress the content of Bunner's communications. Because the injunction is justified without reference to the content of Bunner's communications, it is content neutral. (See *Bartnicki, supra,* 532 U.S. at p. 526 [finding a statute that singled out communications "by virtue of the fact that they were illegally intercepted . . . rather than the subject matter" is content neutral].)

Indeed, the governmental purpose behind protecting trade secrets like the CSS technology through injunctive relief is wholly unrelated to their content. "Trade secret law promotes the sharing of knowledge, and the efficient operation of industry; it permits the individual inventor to reap the rewards of his labor by contracting with a company large enough to develop and exploit it." (*Kewanee Oil Co. v. Bicron Corp.* (1974) 416 U.S. 470, 493 [40 L.Ed.2d 315, 94 S.Ct. 1879] (*Kewanee*).) The law also maintains important standards of commercial ethics. (*Id.* at p. 481.) Assuming, as we do, that the trial court properly applied California's trade secret law, the preliminary injunction necessarily serves the broader governmental purpose behind the law. Because the injunction does not purport to restrict DVD CCA's trade secrets based on their expressive content, the injunction's restrictions on Bunner's speech "properly are characterized as incidental to the primary" purpose of California's trade secret law—which is to promote and reward innovation and technological development and maintain commercial ethics. (*San Francisco Arts & Athletics, Inc. v. United States Olympic Com.* (1987) 483 U.S. 522, 536 [97 L.Ed.2d 427, 107 S.Ct. 2971] (*SFA&A*).)

■ The fact that the preliminary injunction identifies the prohibited speech by its content does not make it content based. "An injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group. It does so, however, because of the group's past actions in the context of a specific dispute between real parties. The parties seeking the injunction assert a violation of their rights; the court hearing the action is charged with fashioning a remedy

for a specific deprivation, not with the drafting of a statute addressed to the general public." (*Madsen, supra,* 512 U.S. at p. 762.) In this case, the specific deprivation to be remedied is the misappropriation of a property interest in *information.* (See § 3426.1, subd. (d) [" 'Trade secret' means information"]; Beckerman-Rodau, *Prior Restraints and Intellectual Property: The Clash Between Intellectual Property and the First Amendment from an Economic Perspective* (2001) 12 Fordham Intell. Prop. Media & Ent. L.J. 1, 60 (*Prior Restraints and Intellectual Property*) ["Like other types of intellectual property, a trade secret is information or knowledge that is commercially valuable" (fn. omitted)].) Thus, any injunction remedying this deprivation must refer to the content of that information in order to identify the property interest to be protected. Such an injunction remains content neutral so long as it serves significant governmental purposes unrelated to the content of the proprietary information. (See *SFA&A, supra,* 483 U.S. at pp. 536–537 [finding that an injunction that specifically prohibits the defendant's use of the word "Olympic" is content neutral because its restrictions serve "the primary congressional purpose of encouraging and rewarding the [United States Olympic Committee's] activities"].) ▮ Because the preliminary injunction at issue here does not "involve government censorship of subject matter or governmental favoritism among different viewpoints," it is content neutral and not subject to strict scrutiny. (*Los Angeles Alliance, supra,* 22 Cal.4th at p. 377.)

*Bartnicki, supra,* 532 U.S. 514, does not mandate a different conclusion. *Bartnicki* addressed the constitutionality of several statutes, including 18 United States Code section 2511(1)(c)—which punished the disclosure of illegally intercepted communications. (*Bartnicki,* at p. 520, fn. 3.) Although the majority observed that a "naked prohibition [like 18 United States Code section 2511(1)(c)] against disclosures is fairly characterized as a regulation of pure speech" (*Bartnicki,* at p. 526), it did not conclude that such a prohibition should be subject to strict scrutiny. Indeed, the *Bartnicki* majority never expressly identified the level of scrutiny it applied. (Smolla, *Information as Contraband: The First Amendment and Liability for Trafficking in Speech* (2002) 96 Nw. U. L.Rev. 1099, 1118 (*Information as Contraband*) ["Astonishingly, at no point in Justice Stevens's opinion does the Court come right out and say what standard of review or doctrinal test it is applying to the laws before it"].) In any event, five justices in *Bartnicki* endorsed the application of a lesser standard even though the statute arguably prohibited "pure speech." (See *Bartnicki, supra,* 532 U.S. 514, 536 (conc. opn. of Breyer, J., joined by O'Connor, J.); *id.* at p. 544 (dis. opn. of Rehnquist, C. J., joined by Scalia, J. and Thomas, J.).) Accordingly, we do the same.

## C.

■ Under the *Madsen* test, "when evaluating a content-neutral injunction . . . [w]e must ask . . . whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." (*Madsen, supra,* 512 U.S. at p. 765.) This test requires "a balance between the governmental interest and the magnitude of the speech restriction." (*SFA&A, supra,* 483 U.S. at p. 537, fn. 16.) As explained below, we conclude that the preliminary injunction issued by the trial court achieves the requisite balance and burdens "no more speech than necessary to serve" the government interests at stake here. (*Madsen,* at p. 765.)

■ As a threshold matter, a preliminary injunction properly issued under California's trade secret law undoubtedly serves significant government interests. "Trade secrets . . . offer no protection against independent invention." (Epstein, *Privacy, Publication, and the First Amendment: The Dangers of First Amendment Exceptionalism* (2000) 52 Stan. L.Rev. 1003, 1036 (*Privacy, Publication, and the First Amendment*).) Rather, "[t]he basic logic of the common law of trade secrets recognizes that private parties invest extensive sums of money in certain information that loses its value when published to the world at large." (*Id.* at p. 1035.) ■ Based on this logic, trade secret law creates a property right "defined by the extent to which the owner of the secret protects his interest from disclosure to others." (*Monsanto, supra,* 467 U.S. at p. 1002.) In doing so, it allows the trade secret owner to reap the fruits of its labor (see *Kewanee, supra,* 416 U.S. at p. 493) and protects the owner's "moral entitlement to" these fruits (*Information as Contraband, supra,* 96 Nw. U. L.Rev. at p. 1164). As such, "trade secrets have been recognized as a constitutionally protected intangible property interest." (*ITT Telecom Products Corp. v. Dooley* (1989) 214 Cal.App.3d 307, 318 [262 Cal.Rptr. 773].)

By creating a limited property right in information, trade secret law "acts as an incentive for investment in innovation." (*Prior Restraints and Intellectual Property, supra,* 12 Fordham Intell. Prop. Media & Ent. L.J. at p. 60.) "Trade secret law encourages the development and exploitation of those items of lesser or different invention than might be accorded protection under the patent laws, but which items still have an important part to play in the technological and scientific advancement of the Nation." (*Kewanee, supra,* 416 U.S. at p. 493.) Like patent and copyright law, trade secret law "prompt[s] the independent innovator to proceed with the discovery and exploitation of his invention." (*Id.* at p. 485.) And without trade secret protection, "organized scientific and technological research could become fragmented, and society, as a whole, would suffer." (*Id.* at p. 486.)

Trade secret law also helps maintain "standards of commercial ethics . . . ." (*Kewanee, supra,* 416 U.S. at p. 481.) "The word 'property' as applied to . . . trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith." (*E.I. Du Pont de Nemours Powder Co. v. Masland* (1917) 244 U.S. 100, 102 [61 L.Ed. 1016, 37 S.Ct. 575].) By sanctioning the acquisition, use, and disclosure of another's valuable, proprietary information by improper means, trade secret law minimizes "the inevitable cost to the basic decency of society when one . . . steals from another." (*Kewanee,* at p. 487.) In doing so, it recognizes that " 'good faith and honest, fair dealing, is the very life and spirit of the commercial world.' " (*Id.* at pp. 481–482, quoting *National Tube Co. v. Eastern Tube Co.* (1902) 13 Ohio Cir.Dec. 468, 3 Ohio C.C. (n.s.) 459, 462 [1902 Ohio Misc. LEXIS 200].)

Assuming, as we do, that the trial court properly granted injunctive relief under California's trade secret law, its preliminary injunction burdens no more speech than necessary to serve these significant government interests. First, prohibiting the disclosure of trade secrets acquired by improper means is the only way to preserve the property interest created by trade secret law and its concomitant ability to encourage invention. "Trade secrets are a peculiar kind of property. Their only value consists in their being kept private." (*In re Iowa Freedom of Information Council* (8th Cir. 1983) 724 F.2d 658, 662.) Thus, "the right to exclude others is central to the very definition of the property interest. Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data." (*Monsanto, supra,* 467 U.S. at p. 1011, fn. omitted.)

The First Amendment does not prohibit courts from incidentally enjoining speech in order to protect a legitimate property right. (See *SFA&A, supra,* 483 U.S. at pp. 526, 537–540 [holding that a statutory injunction prohibiting promotional uses of the word "Olympic" without a showing of a likelihood of confusion does not violate the First Amendment].) And "[t]he mere fact that" Bunner "claims an expressive . . . purpose does not give [him] a First Amendment right to 'appropriat[e] to [himself] the harvest of those who have sown.' " (*Id.* at p. 541, quoting *International News Service v. Associated Press* (1918) 248 U.S. 215, 239–240 [63 L.Ed. 211, 39 S.Ct. 68].) Indeed, the protection of trade secrets and the benefits to research and development derived from the government's recognition of this property right *depend* on the judiciary's power to enjoin disclosures by those who know or have reason to know of their misappropriation. Bunner proffers, and we can think of, no less restrictive way of protecting an owner's constitutionally recognized property interest in its trade secrets. Thus, the preliminary injunction burdens no more speech than necessary to serve the government's interest in encouraging innovation and development.

Second, prohibiting Bunner—who knew or had reason to know that the trade secrets were acquired by improper means—from disclosing those secrets upholds the standard of commercial ethics maintained by trade secret law. ■■ The duty to respect trade secrets imposed "on any person who acquires the secret with knowledge that his transferor had improperly acquired it" is derived from "the rules governing the receipt of stolen or misappropriated land or chattels." (*Privacy, Publication, and the First Amendment, supra,* 52 Stan. L.Rev. at p. 1039.) Under these rules, a purchaser of stolen property with actual or constructive notice of the true owner's interests in that property cannot prevail against that owner. (See, e.g., *Oakland Village Group v. Fong* (1996) 43 Cal.App.4th 539, 549 [50 Cal.Rptr.2d 810] [holding that the defendant, who received funds with constructive knowledge of their conversion, could not prevail against the true owner of the funds]; *Hollywood Nat. Bank v. International Business Machines Corp.* (1974) 38 Cal.App.3d 607, 614–615 [113 Cal.Rptr. 494] [holding that the plaintiff was not a bona fide purchaser of a stock certificate because it had reason to know that the transaction "reeked of chicanery"].) As we explained long ago, these rules recognize that "[o]ne who acquires the property from the fraudulent vendee under such circumstances that he cannot be held to be a purchaser in good faith and for a valuable consideration is in no better position than the fraudulent vendee, and the defrauded party has the same remedies against him that he had against such fraudulent vendee." (*Wendling Lumber Co. v. Glenwood Lumber Co.* (1908) 153 Cal. 411, 414 [95 P. 1029] (*Wendling Lumber*).)

By prohibiting Bunner from exploiting and destroying DVD CCA's trade secrets because of his actual or constructive knowledge of its illegal acquisition, the preliminary injunction merely applies this venerable standard of commercial ethics to a constitutionally recognized property interest in information. Because a person who knowingly exploits the illegal acquisition of property owned by another should be in "no better position than" the illegal acquirer himself (*Wendling Lumber, supra,* 153 Cal. at p. 414), the injunction burdens no more speech than necessary to serve the government's important interest in maintaining commercial ethics.

Nonetheless, Bunner contends the preliminary injunction does not satisfy the *Madsen* test because it enjoins disclosures by those with no connection to DVD CCA or those people who acquired its trade secrets by improper means. According to Bunner, the United States Supreme Court in *Bartnicki* established that limitations on the disclosure of information by those who merely know or have reason to know that the information was obtained unlawfully violate the First Amendment. But *Bartnicki* is distinguishable.

In *Bartnicki,* an unidentified person illegally intercepted and recorded a cell phone conversation between a union negotiator and the union president (the

plaintiffs) discussing the status of collective bargaining negotiations that had received " 'a lot of media attention.' " (*Bartnicki, supra,* 532 U.S. at p. 518.) The defendants, who received a tape of the intercepted conversation from an anonymous source, broadcasted and published a portion of the conversation. The plaintiffs sued the defendants pursuant to statutes penalizing the disclosure of illegally intercepted communications by persons " 'knowing or having reason to know' " that the interception was unlawful. (*Id.* at p. 521, fn. 3.) The United States Supreme Court held that the application of these statutes to the defendants violated the First Amendment. (*Id.* at p. 535.) Despite recognizing the government's strong interest in preserving the privacy of communications, the court concluded that "[t]he enforcement of [the statutes at issue] . . . implicates the core purposes of the First Amendment because it imposes sanctions on the publication of truthful information *of public concern*." (*Id.* at p. 533, italics added.) Thus, the "privacy concerns give way when balanced against the interest in publishing matters of public importance." (*Id.* at p. 534.)

The United States Supreme Court, however, expressly declined to extend *Bartnicki* to "*disclosures of trade secrets* or domestic gossip or other information of purely private concern." (*Bartnicki, supra,* 532 U.S. at p. 533, italics added.) In doing so, the court recognized that the First Amendment interests served by the disclosure of purely private information like trade secrets are not as significant as the interests served by the disclosure of information concerning a matter of public importance. (See *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985) 472 U.S. 749, 759 [86 L.Ed.2d 593, 105 S.Ct. 2939] (plur. opn. of Powell, J.) (*Dun & Bradstreet*) ["speech on matters of purely private concern is of less First Amendment concern" than " 'speech on public issues' "].) "The suppression of the publication of stolen information does nothing to hamper the critic from denouncing any firm that chooses to preserve its trade secrets, or to chide any government agency for its lackluster enforcement of the general law. It is something of a mystery as to how free and open debate is frustrated by offering property protection to trade secrets." (*Privacy, Publication, and the First Amendment, supra,* 52 Stan. L.Rev. at p. 1043.) Thus, *Bartnicki* implicitly acknowledges that a balancing of First Amendment interests against government interests in the trade secret context may yield a different result.

In this case, the content of the trade secrets neither involves a matter of public concern nor implicates the core purpose of the First Amendment. "Whether . . . speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." (*Connick v. Myers* (1983) 461 U.S. 138, 147–148 [75 L.Ed.2d 708, 103 S.Ct. 1684], fn. omitted.) DVD CCA's trade secrets in the CSS technology are not publicly available and convey *only* technical information about the method used by specific private entities to protect their intellectual property. Bunner posted these secrets in the form of DeCSS on

the Internet so Linux users could enjoy and use DVD's and so others could improve the functional capabilities of DeCSS. He did not post them to comment on any public issue or to participate in any public debate. Indeed, only computer encryption enthusiasts are likely to have an interest in the *expressive* content—rather than the uses—of DVD CCA's trade secrets. (See Tien, *Publishing Software as a Speech Act, supra,* 15 Berkeley Tech. L.J. at pp. 662–663 ["Programming languages provide the best means for communicating highly technical ideas—such as mathematical concepts—within the community of computer scientists and programmers"].) Thus, these trade secrets, as disclosed by Bunner, address matters of purely private concern and not matters of public importance. (See *Connick,* at p. 148 [information that, "if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo" does not involve a matter of public concern]; *Dun & Bradstreet, supra,* 472 U.S. at p. 762 ["speech solely in the individual interest of the speaker and its specific . . . audience" does not involve a matter of public concern].)

The mere fact that DVD CCA's trade secrets may have some link to a public issue does not create a legitimate public interest in their disclosure. (Cf. *Board of Trustees of the State University of New York v. Fox* (1989) 492 U.S. 469, 475 [106 L.Ed.2d 388, 109 S.Ct. 3028] [speech merely linking " ' "a product to a current public debate" is not thereby entitled to the constitutional protection afforded noncommercial speech' "].) Disclosure of this highly technical information adds nothing to the public debate over the use of encryption software or the DVD industry's efforts to limit unauthorized copying of movies on DVD's. And the injunction does not hamper Bunner's ability to "discuss and debate" these issues as he has "in the past in both an educational, scientific, philosophical and political context." Bunner does not explain, and we do not see, how any speech addressing a matter of public concern is inextricably intertwined with and somehow necessitates disclosure of DVD CCA's trade secrets. (Cf. *id.* at p. 474 [where nothing requires a speaker to combine his noncommercial message with a commercial message, his commercial speech is not inextricably intertwined with his noncommercial speech and is not entitled to the full protection of the First Amendment].) The expressive content of these trade secrets therefore does not substantially relate to a legitimate matter of public concern. (Cf. *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 223–224 [74 Cal.Rptr.2d 843, 955 P.2d 469] [the publication of private information is only newsworthy if there is a logical nexus between the information and a matter of legitimate public interest].) As such, the First Amendment interests served by the disclosure of DVD CCA's trade secrets are less significant than the First Amendment interests served by the disclosures at issue in *Bartnicki.* (See *Dun & Bradstreet, supra,* 472 U.S. at p. 759 [speech addressing a purely private

matter has less significance under the First Amendment than speech address-ing a matter of public concern].) The First Amendment must therefore give way to the significant government interests served by the preliminary injunc-tion in this particular case.[7]

Finally, the preliminary injunction does not burden more speech than necessary by prohibiting the disclosure of "information derived from" "the DeCSS program, the master keys or algorithms of the [CSS]." Because we assume for purposes of this appeal that the injunction is justified under California's trade secret law, we also assume that this provision of the injunction is necessary to protect DVD CCA's property interest in the misappropriated trade secrets.[8] Therefore, this portion of the injunction burdens no more speech than necessary to serve the significant government interests at issue here. (See *ante*, at pp. 880–881.)

The preliminary injunction issued by the trial court therefore burdens no more speech than necessary to serve the significant government interests promoted by California's trade secret law. Accordingly, it satisfies the *Madsen* test.

### D.

Although the preliminary injunction issued by the trial court survives the *Madsen* test, we must still determine whether the prior restraint doctrine bars it. Because the injunction is content neutral and was issued because of

---

[7] For the same reason, those cases where the United States Supreme Court found unconstitutional statutes or injunctions prohibiting or penalizing the disclosure of confidential information lawfully obtained and substantially related to a matter of public significance are inapposite. (See *The Florida Star v. B.J.F.* (1989) 491 U.S. 524 [105 L.Ed.2d 443, 109 S.Ct. 2603] [holding that a statute making it unlawful to disclose the name of a victim of a sexual offense obtained lawfully from the government itself violated the First Amendment]; *Smith v. Daily Mail Publishing Co.* (1979) 443 U.S. 97 [61 L.Ed.2d 399, 99 S.Ct. 2667] [holding that a criminal statute punishing a newspaper for publishing the name of a juvenile offender lawfully obtained violated the First Amendment]; *Landmark Communications, Inc. v. Virginia* (1978) 435 U.S. 829 [56 L.Ed.2d 1, 98 S.Ct. 1535] [holding that a criminal statute punishing the dissemination of information about a proceeding before a state judicial review commission lawfully obtained from the government violated the First Amendment]; *Oklahoma Publishing Co. v. District Court* (1977) 430 U.S. 308 [51 L.Ed.2d 355, 97 S.Ct. 1045] [holding that an injunction barring the news media from publishing the name or picture of a juvenile offender obtained lawfully violated the First Amendment]; *Cox Broadcasting Corp. v. Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029] [holding that a criminal statute punishing the publication or broadcast of the name or identity of a rape victim obtained lawfully violated the First Amendment].) Indeed, the United States Supreme Court has acknowledged that these cases may not apply where, as here, the "sensitive information rests in private hands" (*The Florida Star*, at p. 534) or the information was obtained unlawfully (*id.* at p. 535, fn. 8).

[8] On remand, the Court of Appeal should determine whether the preliminary injunction, including this portion, is justified under California's trade secret law.

Bunner's prior unlawful conduct, we conclude it is not a prior restraint and therefore does not violate the First Amendment.

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." (*Nebraska Press Assn. v. Stuart* (1976) 427 U.S. 539, 559 [49 L.Ed.2d 683, 96 S.Ct. 2791].) "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' [Citation.] Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." (*Alexander v. United States* (1993) 509 U.S. 544, 550 [125 L.Ed.2d 441, 113 S.Ct. 2766].) Nonetheless, the United States Supreme Court "has never held that all injunctions are impermissible." (*Pittsburgh Press Co. v. Human Rel. Comm'n* (1973) 413 U.S. 376, 390 [37 L.Ed.2d 669, 93 S.Ct. 2553].) "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." (*Ibid.*) Thus, "[n]ot all injunctions that may incidentally affect expression . . . are 'prior restraints' . . . ." (*Madsen, supra,* 512 U.S. at p. 763, fn. 2.)

Despite these pronouncements, the United States Supreme Court has "neither defined prior restraint, nor explained precisely why injunctions fit within a definition of prior restraint." (Meyerson, *Rewriting Near v. Minnesota: Creating a Complete Definition of Prior Restraint* (2001) 52 Mercer L.Rev. 1087, 1087.) Nonetheless, the court has provided some guiding principles. For example, the court has recently held that *only* content-based injunctions are subject to prior restraint analysis. (See *Thomas v. Chicago Park District* (2002) 534 U.S. 316, 321–322 [151 L.Ed.2d 783, 122 S.Ct. 775] [holding that a licensing scheme did not need to "contain certain procedural safeguards in order to avoid constituting an invalid prior restraint" because the scheme was "not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum"]; see also *Avis Rent A Car System, Inc. v. Aguilar* (2000) 529 U.S. 1138, 1142 [146 L.Ed.2d 971, 120 S.Ct. 2029] (dis. opn. of Thomas, J., to den. of pet. for cert.) [noting that "a content-neutral injunction is not treated as a prior restraint"].) ▆ Based on our review of high court decisions, we have also observed that "[a] prior restraint is a *content-based* restriction on speech *prior to its occurrence.*" (*Planned Parenthood Shasta-Diablo, Inc. v. Williams* (1994) 7 Cal.4th 860, 871 [30 Cal.Rptr.2d 629, 873 P.2d 1224], italics added (*Planned Parenthood I*).) Consistent with these guiding principles, the United States Supreme Court has declined to apply prior restraint analysis to a permanent injunction (*Madsen, supra,* 512 U.S. at p. 763, fn. 2) and a preliminary injunction (*Schenck v. Pro-Choice Network of Western New York* (1997) 519 U.S. 357, 374, fn. 6 [137 L.Ed.2d 1, 117 S.Ct. 855] (*Schenck*))

"issued not because of the content of petitioners' expression . . . but because of their prior unlawful conduct" (*Madsen*, at p. 763, fn. 2; see also *Schenck*, at p. 374, fn. 6).

Applying these principles, we find that the preliminary injunction at issue here is not a prior restraint. The injunction is content neutral (see *ante*, at pp. 877–879), and the trial court found that Bunner had previously disclosed DVD CCA's trade secrets in violation of California law. The court therefore issued the content-neutral injunction because of Bunner's "prior unlawful conduct." (*Madsen, supra*, 512 U.S. at p. 763, fn. 2.) Although the court made its finding of prior unlawful conduct in the context of a preliminary injunction and found only that DVD CCA was likely to succeed on the merits, this finding is sufficient to render inapplicable the heavy presumption against prior restraints. (See *Schenck, supra*, 519 U.S. at p. 374, fn. 6 [refusing to apply prior restraint analysis to a *preliminary injunction* because the injunction was content neutral and directed at prior unlawful conduct].) Thus, "[t]his is not a case of government censorship, but a private plaintiff's attempt to protect its property rights." (*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, LTD.* (2d Cir. 1979) 604 F.2d 200, 206.) Accordingly, prior restraint doctrine does not bar the injunction.

*CBS Inc. v. Davis* (1994) 510 U.S. 1315 [127 L.Ed.2d 358, 114 S.Ct. 912] is inapposite. In *CBS*, a federal district court issued an injunction "prohibiting CBS from airing videotape footage taken at the factory of Federal Beef Processors, Inc." (Federal) (*id.* at p. 1325), because the tape disclosed Federal's " 'confidential and proprietary practices and processes . . . .' " (*Id.* at p. 1316.) Concluding that the injunction was an unconstitutional prior restraint, Justice Blackmun stayed its enforcement. (*Id.* at pp. 1317–1318.) As a single-justice order, *CBS* is arguably not binding on this court. In any event, it is distinguishable. Justice Blackmun, in finding a prior restraint, relied on the lack of clear evidence establishing that CBS had acquired Federal's proprietary information by improper means. (*Id.* at p. 1318.) In contrast, we assume for purposes of this appeal that Bunner knew or had reason to know that DVD CCA's trade secrets were acquired by improper means. Moreover, unlike the trade secrets at issue here (see *ante*, at pp. 883–885), the videotape footage at issue in *CBS* appeared to address a matter of public concern— "unsanitary practices in the meat industry" (*CBS*, at p. 1315).

Likewise, the out-of-state cases cited by Bunner are not persuasive. In *Bridge C.A.T. Scan Associates v. Technicare Corp.* (2d Cir. 1983) 710 F.2d 940, the Second Circuit Court of Appeals invalidated an injunction prohibiting the plaintiff from disclosing trade secrets contained in an exhibit to its complaint. In finding that the injunction was an invalid prior restraint, the court concluded that there was no evidence the plaintiff had acquired the

defendant's trade secrets by improper means or that the secrets were not publicly available. (*Id.* at pp. 946-947.) In this decision, however, we assume that Bunner misappropriated protectable trade secrets.

*Oregon ex rel. Sports Mgmt. News v. Nachtigal* (1996) 324 Ore. 80 [921 P.2d 1304] is inapposite for similar reasons. In *Nachtigal*, the Oregon Supreme Court found that a statute requiring court approval before a person involved in litigation may disclose a trade secret constituted an invalid prior restraint. (*Id.* at pp. 90-91.) The statute required court approval "even when there is no allegation that the third-party publisher has violated the criminal or civil law to possess the information." (*Id.* at p. 83.) By contrast, DVD CCA alleged and established that Bunner misappropriated its trade secrets in violation of California law. Moreover, *Nachtigal* expressly distinguished the statute at issue from another Oregon statute authorizing injunctive relief for the misappropriation of trade secrets (*id.* at p. 90), and noted that its holding did not render the injunctive relief provision unconstitutional (*id.* at p. 91, fn. 10). In any event, to the extent *Nachtigal*'s literalistic analysis of content neutrality conflicts with our decision here, we have impliedly rejected it (see *Los Angeles Alliance, supra,* 22 Cal.4th at pp. 367-368), and therefore do not find it persuasive.

*Proctor & Gamble Co. v. Bankers Trust Co.* (6th Cir. 1996) 78 F.3d 219 is also distinguishable. In *Proctor & Gamble,* the Sixth Circuit Court of Appeals held that an order prohibiting Business Week from using Proctor & Gamble's confidential and proprietary information in an article constituted an invalid prior restraint. The court reached this conclusion in part because the district court never determined whether the information used in the article was even proprietary—much less a trade secret—before issuing the order. (See *id.* at p. 225 [finding that "the District Court fail[ed] to conduct any First Amendment inquiry before granting the two TROs"]; see also *id.* at p. 222 [noting that "[t]he parties and not the court . . . determine[d] whether the particular documents" were proprietary].) By contrast, the trial court in this case issued the preliminary injunction *after* finding that Bunner likely misappropriated DVD CCA's trade secrets in violation of California law. Moreover, unlike Bunner, Business Week had not disclosed any proprietary information prior to the issuance of the order. (*Id.* at p. 222.) In any event, *Proctor & Gamble* is less than helpful because the Sixth Circuit Court of Appeals apparently assumed the order was a prior restraint and offered no analysis to support its assumption. For this reason, we also decline to adopt the reasoning of *Ford Motor Co. v. Lane* (E.D.Mich. 1999) 67 F.Supp.2d 745. Accordingly, the preliminary injunction is not an invalid prior restraint under the First Amendment.

## IV.

We now turn to Bunner's final contention—that the preliminary injunction violates the free speech provision found in article I, section 2, subdivision (a) of the California Constitution. "[T]he California Constitution is independent and . . . federal decisions interpreting the First Amendment are not controlling." (*Los Angeles Alliance, supra,* 22 Cal.4th at p. 367.) Nonetheless, "[i]n some areas we have found that the protection afforded by the California liberty of speech clause is coterminous with that provided by the federal Constitution." (*Id.* at p. 367, fn. 12.) For example, we have regularly applied the *Madsen* test when determining the constitutionality of a content-neutral injunction. (See, e.g., *Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1099–1122 [929 P.2d 596]; *Planned Parenthood II, supra,* 10 Cal.4th at pp. 1019–1025.) Likewise, we have refused to apply prior restraint analysis to content-neutral injunctions directed at prior unlawful conduct. (See *Planned Parenthood I, supra,* 7 Cal.4th at p. 871.) Bunner cites, and we have found, nothing to suggest that our analysis of the constitutionality of the injunction under California's free speech clause would yield a different result from our analysis under the First Amendment in this context. Accordingly, we conclude that the preliminary injunction does not violate the California Constitution.

## V.

Our decision today is quite limited. We merely hold that the preliminary injunction does not violate the free speech clauses of the United States and California Constitutions, *assuming* the trial court properly issued the injunction under California's trade secret law. On remand, the Court of Appeal should determine the validity of this assumption. Because there appears to be some confusion over the proper standard of review, we offer guidance below.

In upholding the preliminary injunction against Bunner's First Amendment challenges, we rely on the assumption that DVD CCA is likely to prevail on the merits of its trade secret claim against Bunner. As such, "any factual findings subsumed" in the trade secret misappropriation determination "are subject to constitutional fact review." (*Rankin v. McPherson* (1987) 483 U.S. 378, 385, fn. 8 [97 L.Ed.2d 315, 107 S.Ct. 2891].) "[W]here a Federal right has been denied as the result of a [factual] finding . . . or where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts," the reviewing court must independently review these findings. (*Fiske v. State of Kansas* (1927) 274 U.S. 380, 385–386 [71 L.Ed. 1108, 47 S.Ct. 655].) "[F]acts that are germane to" the First Amendment analysis "must be sorted out and reviewed de novo, independently of any previous determinations by the trier of fact." (*McCoy v. Hearst Corp.* (1986) 42 Cal.3d

835, 842 [231 Cal.Rptr. 518, 727 P.2d 711].) And "the reviewing court must ' "examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect." ' " (*Harte–Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 688 [105 L.Ed.2d 562, 109 S.Ct. 2678], quoting *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 285 [11 L.Ed.2d 686, 84 S.Ct. 710].)

On remand, the Court of Appeal must therefore "make an independent examination of the entire record" (*Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 499 [80 L.Ed.2d 502, 104 S.Ct. 1949]), and determine whether the evidence in the record supports the factual findings necessary to establish that the preliminary injunction was warranted under California's trade secret law (see *Lindsay v. City of San Antonio* (5th Cir. 1987) 821 F.2d 1103, 1107–1108 [noting that appellate courts must independently review factual findings relevant to the resolution of any First Amendment issues]). If, after this examination, the court finds the injunction improper under California's trade secret law, then it should find that the trial court abused its discretion. (See *ibid.* [holding that, in determining whether the "issuance of a preliminary injunction constitutes an abuse of" discretion under the First Amendment, the reviewing court must independently review the factual findings subsumed in the constitutional determination]; see also *Gallo v. Acuna, supra,* 14 Cal.4th at p. 1109 [holding that preliminary injunctions are reviewed "under an abuse of discretion standard"].) Otherwise, it should uphold the injunction.

## DISPOSITION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

George, C. J., Baxter, J., Rivera, J.,* and Robie, J.,† concurred.

**WERDEGAR, J.,** Concurring.—I write separately because I agree partly with the majority and partly with Justice Moreno. I agree with the majority's conclusion that the First Amendment to the United States Constitution does not necessarily preclude injunctive relief in trade secret cases. I find in Justice Moreno's concurring opinion, however, a more satisfying reconciliation of that conclusion with the constitutional rules governing prior restraints and content-based restrictions of speech.

---

*Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

† Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The court agrees that a reviewing court in First Amendment cases must examine the entire record independently to ensure that the factual predicates for injunctive relief truly exist. Justice Moreno would have us conduct that examination ourselves. Certainly we have the power to do so. In my view, however, considerations of judicial economy justify the majority's decision to leave this factually intensive task to the Court of Appeal. (See Cal. Const., art. VI, § 12, subd. (c); Cal. Rules of Court, rule 29(b)(3).)

**MORENO, J.**—I concur in the majority's narrow holding, which, as I understand it, is that the First Amendment does not categorically prohibit preliminary injunctions to enjoin the publication of trade secrets. I further agree that the First Amendment requires independent appellate review of such preliminary injunctions, rather than the deferential review usually accorded such injunctions. I write separately for two reasons. First, I believe there is a need to clarify how the prior restraint doctrine under the First Amendment applies to the publication of alleged trade secrets. Second, I would forgo further proceedings in the Court of Appeal and simply affirm that court's judgment. In my view, the DVD Copy Control Association's (DVD CCA) trade secret claim against Bunner is patently without merit for the reasons explained below.

I.

I agree with the majority that computer code is a form of speech under the First Amendment. "Because computer code 'is an expressive means for the exchange of information and ideas about computer programming' [citation], 'we join the other courts that have concluded that computer code, and computer programs constructed from code can merit First Amendment protection.' " (Maj. opn., *ante*, at p. 876.)

I also agree with the majority that the doctrine of prior restraint is not a model of clarity, and that the definitions of and justifications for the doctrine do not constitute a coherent doctrinal unity. (See Tribe, American Constitutional Law (2d ed. 1988) pp. 1039–1042 [noting that the "prior" in prior restraint can mean both prior to publication and prior to the full adjudication of the merits].) But the majority correctly identifies one of the meanings of and reasons for the prohibition against prior restraint, quoting *Pittsburgh Press Co. v. The Pittsburgh Commission on Human Relations* (1973) 413 U.S. 376, 390 [37 L.Ed.2d 669, 93 S.Ct. 2553] (*Pittsburgh Press Co.*): " 'The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.' " (Maj. opn., *ante*, at p. 886.) Thus, a preliminary injunction poses a danger that permanent injunctive relief does not: that potentially protected speech

will be enjoined prior to an adjudication on the merits of the speaker's or publisher's First Amendment claims. *Pittsburgh Press Co.* recognized as much when affirming an order prohibiting sex discrimination in a newspaper's classified ads: "[B]ecause no interim relief was granted, the order will not have gone into effect before our final determination that the actions of Pittsburgh Press were unprotected." (*Pittsburgh Press Co.*, *supra*, 413 U.S. at p. 390; see also Lemley & Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases* (1998) 48 Duke L.J. 147, 158–164, 216–224 (Lemley & Volokh) [arguing that an important purpose of the prior restraint doctrine should be curtailing premature censorship of potentially protected speech through preliminary injunctions]; Redish, *The Proper Role of the Prior Restraint Doctrine in First Amendment Theory* (1984) 70 Va. L.Rev. 53, 87–88 (Redish) [arguing that the prior restraint doctrine recognizes that interim equitable relief poses a particular danger to First Amendment rights].)

The same distinction was recognized by this court in *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 138 [87 Cal.Rptr.2d 132, 980 P.2d 846] (*Aguilar*), upholding a permanent injunction enjoining the use of certain racial epithets in the workplace. The *Aguilar* plurality quoted approvingly from *Auburn Police Union v. Carpenter* (1st Cir. 1993) 8 F.3d 886, 903, which upheld a statute prohibiting charitable solicitation for the benefit of law enforcement agencies: " 'Although the classic form of prior restraint involves an administrative licensing scheme [citation], a judicial injunction that prohibits speech *prior to a determination that the speech is unprotected* also constitutes a prior restraint. [Citation.] . . . An injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted *only after a final adjudication on the merits* that the speech is unprotected does not constitute an unlawful prior restraint.' " (*Aguilar*, *supra*, 21 Cal.4th at p. 141, italics added.)

The present case involves a preliminary injunction issued prior to "a final adjudication on the merits that the speech is unprotected." Hence, the danger posed by prior restraint is present. In general, a prior restraint comes with a " 'heavy presumption' against its constitutional validity." (*Organization for a Better Austin v. Keefe* (1971) 402 U.S. 415, 419 [29 L.Ed.2d 1, 91 S.Ct. 1575].)

The majority at one point seems to suggest that the bar against prior restraint never applies to trade secret publication cases if a court has made a preliminary finding that a defendant's prior conduct has been unlawful. It generalizes that the United States Supreme Court "has declined to apply prior restraint analysis to a permanent injunction (*Madsen* [*v. Women's Health Center* (1994)] 512 U.S. [753,] 763, fn. 2) and a preliminary injunction (*Schenck v. Pro-Choice Network of Western New York* (1997) 519 U.S. 357,

374, fn. 6 [137 L.Ed.2d 1, 117 S.Ct. 855] (*Schenck*)) 'issued not because of the content of petitioners' expression . . . but because of their prior unlawful conduct' (*Madsen*, at p. 763, fn. 2; see also *Schenck*, at p. 374, fn. 6)." (Maj. opn., *ante*, at pp. 886–887.) The majority concludes: "The injunction [in this case] is content neutral . . . , and the trial court found that Bunner had previously disclosed DVD CCA's trade secrets in violation of California law. The court therefore issued the content-neutral injunction because of Bunner's 'prior unlawful conduct.' (*Madsen, supra*, 512 U.S. at p. 763, fn. 2.) Although the court made its finding of prior unlawful conduct in the context of a preliminary injunction and found only that DVD CCA was likely to succeed on the merits, this finding is sufficient to render inapplicable the heavy presumption against prior restraints. (See *Schenck, supra*, 519 U.S. at p. 374, fn. 6 [refusing to apply prior restraint analysis to a *preliminary injunction* because the injunction was content neutral and directed at prior unlawful conduct].)" (Maj. opn., *ante*, at p. 887.)

The majority's analysis of the above cited cases is incomplete. A closer reading of these cases reveals that the United States Supreme Court declined to apply prior restraint analysis not simply because those cases concerned findings of past unlawful conduct, but also because they did not involve censorship of speech but merely limits on its time, place and manner. For example, footnote 2 of *Madsen*, on which the majority relies, states that prior restraint is not applicable because "petitioners are not prevented from expressing their message in any one of several different ways; they are simply prohibited from expressing it within the 36-foot buffer zone. Moreover, the injunction was issued not because of the content of petitioners' expression . . . but because of their prior unlawful conduct." (*Madsen, supra*, 512 U.S. at p. 763, fn. 2.) *Schenck, supra*, 519 U.S. at page 374, footnote 6, also emphasizes both reasons: "[A]lternative channels of communication were left open to the protesters, and 'the injunction was issued not because of the content of [the protesters'] expression, . . . but because of their prior unlawful conduct.' "

Our opinion in *Planned Parenthood Shasta-Diablo, Inc. v. Williams* (1994) 7 Cal.4th 860 [30 Cal.Rptr.2d 629, 873 P.2d 1224], also cited in support of the majority's position, highlights the locational nature of the injunction, in rejecting the applicability of prior restraint analysis: "[P]etitioners' claim that the injunction operates as an unconstitutional 'prior restraint' on protected speech must fail. A prior restraint is a content-based restriction on speech prior to its occurrence. [Citation.] Valid time, place and manner restrictions which do not functionally prohibit all means of communication are not prior restraints." (*Id.* at p. 871, fn. omitted.)

In *Thomas v. Chicago Park District* (2002) 534 U.S. 316 [151 L.Ed.2d 783, 122 S.Ct. 775], also cited by the majority, the court upheld a facial

challenge to a municipal park ordinance that required a permit for a more-than-50-person event. The court rejected the argument that it was an invalid prior restraint similar to an administrative licensing scheme designed to promote censorship, holding that a licensing scheme did not need to "contain certain procedural safeguards in order to avoid constituting an invalid prior restraint" because the scheme was "not subject-matter censorship but content-neutral time, place, and manner regulation of the use of a public forum." (*Id.* at pp. 321–322.)

The preliminary injunction in this case is subject-matter censorship entirely prohibiting Bunner from publishing a particular type of information related to the DVD CCA's content scrambling system (CSS) and the descrambling program (DeCSS), not a content-neutral time, place, and manner regulation. (See also *Oregon ex rel. Sports Mgmt. News v. Nachtigal* (Or. 1996) 324 Ore. 80 [921 P.2d 1304, 1308] [law requiring court approval of publication of alleged trade secrets is directed at a "specific subject of communication, excluding some speech based on the content of the message" and is an unlawful prior restraint].) If the alleged trade secret is not in fact a trade secret, then the court will be enjoining protected speech. A preliminary injunction issued prior to an adjudication on the merits would therefore pose the precise danger of prior restraint identified in *Pittsburgh Press Co.*, i.e., "the special vice . . . that communication will be suppressed . . . before an adequate determination that it is unprotected by the First Amendment.' " (*Pittsburgh Press Co.*, *supra*, 413 U.S. at p. 390; see also Lemley & Volokh, *supra*, 48 Duke L.J. at pp. 169–172; Redish, *supra*, 70 Va. L.Rev. at p. 88.) But that particular "special vice" would not threaten in the case of time, place, and manner restrictive injunctions or ordinances, where speech is not being entirely suppressed; instead, the special vice of those regulations is that their restrictions may be stricter than needed to accomplish the government objective. (See *Madsen*, *supra*, 512 U.S. at pp. 765–766.)[1]

---

[1] In further support of its claim that the prior restraint doctrine does not apply, the majority quotes without discussion the statement in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.* (2d Cir. 1979) 604 F.2d 200, 206, that "[t]his is not a case of government censorship, but a private plaintiff's attempt to protect its property rights." If this dictum is supposed to convey that the prior restraint doctrine applies only to official government censorship and not to injunctions issued in the course of litigation between private parties, then it is simply untrue. (See *Metropolitan Opera Association, Inc. v. Local 100, Hotel & Restaurant Employees International Union* (2d Cir. 2001) 239 F.3d 172, 176 [preliminary injunction against publication an unlawful prior restraint in private defamation actions].) Nor is it at all clear that the prior restraint doctrine does not apply whenever a plaintiff claims its intellectual property rights are being violated.

It should also be noted that the Court of Appeal properly rejected the DVD CCA's reliance on copyright cases in arguing that preliminary injunctions should be routinely granted. As the Court of Appeal stated: "Protections for trade secrets . . . are not comparable to protections for copyrights with respect to the First Amendment. First, since both the First Amendment and the constitutional authority underlying the Copyright Act are contained in the United States

But concluding that prior restraint analysis applies in the case of preliminary injunctions of alleged trade secret publications is not the same as concluding that all such injunctions are prohibited. Both the United States Supreme Court and this court have recognized that the First Amendment right to free expression may be legitimately circumscribed by state law intellectual property rights. (See *Cohen v. Cowles Media Co.* (1991) 501 U.S. 663, 669-670 [115 L.Ed.2d 586, 111 S.Ct. 2513] [newspaper's right to publish limited by confidentiality agreement enforceable under state contract law]; *Zacchini v. Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562 [53 L.Ed.2d 965, 97 S.Ct. 2849] [upholding right of publicity against having performance misappropriated by television broadcast]; *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 396 [106 Cal.Rptr.2d 126, 21 P.3d 797] [upholding right of publicity against literal depictions of celebrities].) Trade secret law is an indisputably important means of protecting a certain form of intellectual property for the benefit of society as a whole. (See *Kewanee Oil Co. v. Bicron Corp.* (1974) 416 U.S. 470, 481, 493 [40 L.Ed.2d 315, 94 S.Ct. 1879]; maj. opn., *ante*, at p. 878.) As the majority correctly recognizes, "trade secret law creates a property right 'defined by the extent to which the owner of the secret protects his interest from disclosure to others.' " (Maj. opn., *ante*, at p. 880, quoting *Ruckelshaus v. Monsanto Co.* (1984) 467 U.S. 986, 1002 [81 L.Ed.2d 815, 104 S.Ct. 2862].) Because the very existence of a trade secret is destroyed by its disclosure, a categorical inability by trade secret holders to obtain preliminary injunctive relief against the publication of trade secrets could significantly undermine their property rights. (See *Garth v. Staktek Corp.* (Tex.App. 1994) 876 S.W.2d 545, 550 [preliminary injunction necessary "to provide meaningful legal protection" to trade secret holders].) In this respect, a trade secret plaintiff differs, for example, from defamation plaintiffs who may rectify damages to their reputation not only with monetary damages but also through the rehabilitation of their reputation with additional speech and publication. Furthermore, as the majority suggests, the fact that publication of most trade secrets does not

Constitution, the resolution of a conflict between free speech and copyright involves a delicate balancing of two federal constitutional protections. Article I of the United States Constitution explicitly grants Congress the power 'To promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.' (U.S. Const., art. I, § 8.) The [Uniform Trade Secrets Act], on the other hand, lacks any constitutional foundation. . . . [¶] Second, injunctions in copyright infringement cases have been upheld 'on the ground that First Amendment concerns are protected by and coextensive with the [Copyright Act's] fair use doctrine.' (*Nihon Keizai Shimbun, Inc. v. Comline Business Data* (2d Cir. 1999) 166 F.3d 65, 74.) The 'fair use' exception permits copying and use of a copyrighted work 'for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research' under certain circumstances. (17 U.S.C. § 107.) It 'offers a means of balancing the exclusive rights of a copyright holder with the public's interest in dissemination of information affecting areas of universal concern, such as art, science and industry. . . . In contrast, the UTSA contains no exception for 'fair use' or any other vehicle for safeguarding First Amendment concerns."

address matters of publicconcern is a factor that may somewhat lighten the heavy presumption against the constitutional validity of a prior restraint.

The question, then, is how should a court balance First Amendment protections with an alleged trade secret holder's property rights when asked to issue a preliminary injunction against publication? The answer lies in requiring the plaintiff to make a sufficient evidentiary showing before the injunction is granted.

The majority recognizes that a preliminary injunction against the disclosure of an alleged trade secret without sufficient evidentiary support is an unlawful prior restraint. As it states in discussing *Bridge C.A.T. Scan Associates v. Technicare Corp.* (2d Cir. 1983) 710 F.2d 940: "[T]he Second Circuit Court of Appeals invalidated an injunction prohibiting the plaintiff from disclosing trade secrets contained in an exhibit to its complaint. In finding that the injunction was an invalid prior restraint, the court concluded that there was no evidence the plaintiff had acquired the defendant's trade secrets by improper means or that the secrets were not publicly available. [Citation.] In this decision, however, we assume that Bunner misappropriated protectable trade secrets." (Maj. opn., *ante*, at pp. 887–888.) In its discussion of *CBS Inc. v. Davis* (1994) 510 U.S. 1315 [127 L.Ed.2d 358, 114 S.Ct. 912], the majority also distinguishes it from the present case in part because "Justice Blackmun, in finding a prior restraint, relied on the lack of clear evidence establishing that CBS had acquired [the plaintiff's] proprietary information by improper means." (Maj. opn., *ante*, at p. 887.) Implicit in these statements is the assumption that a preliminary injunction of a trade secret publication without the requisite evidence in support would be an unlawful prior restraint.

I agree, but this conclusion raises the question of what evidentiary showing a plaintiff should be required to make in order to overcome the presumption against a prior restraint. Ideally, the required showing for granting preliminary injunctions would separate meritorious trade secret claims from those involving protected speech. A court is to grant a preliminary injunction only if it finds a " 'likelihood that the plaintiff will prevail on the merits at trial' " as well as that the interim balance of harms favors the plaintiff. (*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) But in reality, courts are accorded a great deal of leeway in deciding whether to grant such injunctions. " ' "[By] balancing the respective equities of the parties, [the trial court] concludes that, pending a trial on the merits, the defendant should or . . . should not be restrained from exercising the right claimed by him." ' [Citation.] [¶] . . . Generally, the ruling on an application for a preliminary injunction rests in the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal absent a showing that it has been abused." (*Ibid.*) A trial court may grant a preliminary

injunction based only on a showing that "the questions of law or fact are grave and difficult," and the balance of harms favors plaintiff. (*Wilms v. Hand* (1951) 101 Cal.App.2d 811, 815 [226 P.2d 728].)

In my view, the need to safeguard the First Amendment right against prior restraint, while not barring trade secret holders from obtaining preliminary injunctions, requires that we make the standard for granting such injunctions more rigorous. As Professor Redish has stated: "[B]ecause such prior restraints are imposed by a judicial officer following some form of adversarial judicial process, the heavy negative presumption traditionally associated with the prior restraint doctrine is inappropriate. Nevertheless, because prior restraints are issued following only an abbreviated judicial inquiry, they are properly employed only if the asserted governmental interest could not be adequately protected by regulation following a full adversarial trial and only if the court determines that a strong likelihood exists that the government will be able to establish that the challenged expression is regulable under substantive first amendment standards. . . . The traditional equitable principle that the issuance of such preliminary relief is largely a matter of the court's discretion . . . would have to change. Such broad discretion is not consistent with first amendment concerns, and any court issuing such preliminary relief against expression should expect no deference in the course of appellate review." (Redish, *supra*, 70 Va. L.Rev. at pp. 88-89, fns. omitted.)

A preliminary injunction in the case of an alleged trade secret publication may be appropriate because the trade secret holder's property rights "could not be adequately protected by regulation following a full adversarial trial." (Redish, *supra*, 70 Va. L.Rev. at p. 88.) But when a publication presumptively protected by the First Amendment is alleged to contain trade secrets, the broad discretion usually granted trial courts in these matters should be, while not eliminated entirely, considerably narrowed. A mere showing that the questions of law or fact are grave and difficult would be insufficient to warrant a preliminary injunction. Rather, a plaintiff should be required to *actually* establish a likelihood of prevailing on the merits, regardless of the balance of harms.

The majority, as I understand it, implicitly acknowledges this heightened standard when it holds, based on general First Amendment principles, that a trial court's determination in these cases would be subject to independent appellate review. As the majority states: "[T]he Court of Appeal must . . . 'make an independent examination of the entire record' (*Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 499 [80 L.Ed.2d 502, 104 S.Ct. 1949]), and determine whether the evidence in the record supports the factual findings necessary to establish that the preliminary injunction was warranted under California's trade secret law." (Maj. opn., *ante*, at p. 890.)

The First Amendment's requirement that appellate courts make an independent examination of the whole record is designed to "make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " (*Bose Corp. v. Consumers Union of U.S., Inc., supra,* 466 U.S. at p. 499.) Accordingly, an appellate court must overturn the issuance of a preliminary injunction against a publication allegedly containing trade secrets if it finds, on its own examination of the record, no likelihood that the trade secret holder will prevail on the merits. Otherwise, such independent appellate review would be devoid of meaning.

In sum, a preliminary injunction on speech issued without a credible determination that plaintiff will prevail on the merits is a quintessential case of suppressing speech " 'before an adequate determination that it is unprotected by the First Amendment' " (*Pittsburgh Press Co., supra,* 413 U.S. at p. 390) and would therefore be an unlawful prior restraint. Unlike the Court of Appeal, however, I would hold that when the alleged trade secret holder bringing an action against a trade secret publisher or would-be publisher actually establishes *both* a likelihood that it will prevail on the merits, and that the balance of harms is in its favor, the issuance of a preliminary injunction would be an appropriate means of preserving the secrecy that is the essence of plaintiff's property interest, subject to independent appellate review. Because the majority arrives at essentially the same conclusion, albeit by a different analytical path, I concur in its holding.[2]

## II.

As we recently reaffirmed: " '[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable.' " (*Winter v. DC Comics* (2003) 30 Cal.4th 881, 891 [134 Cal.Rptr.2d 634, 69 P.3d 473].) Undertaking independent review, I conclude, as a matter of law, that there is no likelihood that the DVD CCA would prevail on the merits. There is therefore no need to remand to the Court of Appeal for further proceedings. The unnecessary delay in resolving this litigation can only further burden speech protected by the First Amendment.

As explained in the majority opinion, Bunner is alleged to have downloaded from the Internet and republished the DeCSS source code incorporating CSS, the DVD CCA's proprietary information. The general rule is that

---

[2] I note that the above standard applies only when there is no indication that the trade secret involves matters of public concern, as in the present case. As the majority suggests, when public concern is implicated, the burden of overcoming the presumption against prior restraint would be substantially higher. (See *New York Times v. United States* (1971) 403 U.S. 713 [29 L.Ed.2d 822, 91 S.Ct. 2140].)

"[o]nce the secret is out, the rest of the world may well have a right to copy it at will; but this should not protect the misappropriator or his privies." (*Underwater Storage, Inc. v. United States Rubber Co.* (D.C. Cir. 1966) 371 F.2d 950, 955.) DeCSS was not demonstrably secret in this case when Bunner republished it, and Bunner was neither alleged to be the original misappropriator nor to be in privity with any such misappropriators.

Civil Code section 3426.1, subdivision (d) defines "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." A legislative committee comment further states: "The language 'not being generally known to the public or to other persons' does not require that information be generally known to the public for trade secret rights to be lost. If the principal person who can obtain economic benefit from information is aware of it, there is no trade secret. A method of casting metal, for example, may be unknown to the general public but readily known within the foundry industry." (Legis. Com. com., 12A pt.1 West's Ann. Civ. Code (1997 ed.) foll. Civ. Code, § 3426.1, p. 239 (Legislative Committee Comment).)

The Legislative Committee Comment further explains the original draft defined a trade secret in part as "not being readily ascertainable by proper means" and that "the assertion that a matter is readily ascertainable by proper means remains available as a defense to a claim of misappropriation. [¶] Information is readily ascertainable if it is available in trade journals, reference books, or published materials." (Legis. Com. com., 12A pt. 1 West's Ann. Civ. Code, *supra*, foll. Civ. Code, § 3426.1, p. 239.)

Therefore, had Bunner obtained DeCSS information from a computer magazine or a newspaper, the information would be considered "readily ascertainable" and not a trade secret. Instead, he learned of DeCSS from a computer discussion group and downloaded it from a Web site on the Internet. The date of Bunner's initial posting is unclear from the record, and the availability of DeCSS on the Internet at the time of the posting is also not clear. The DVD CCA's attorney declared that at the time the complaint against Bunner and others was filed in December 1999, approximately two months after the initial posting, at least 118 Web sites had been identified that either contained proprietary information related to CSS or provided links to other Web sites with such information. How can information published in a computer magazine be regarded as "readily ascertainable" but not information

published on numerous Web sites? Nor is it at all clear that information published in a trade journal would have greater permanency than information published on the Internet.[3]

Courts that have considered the matter have agreed that, generally speaking, a party not involved in the initial misappropriation of a trade secret cannot be prosecuted under trade secret law for downloading and republishing proprietary information posted on the Internet, primarily because the information is in the public domain and is no longer secret. (*Religious Technology Center v. Netcom On-Line Communications Services, Inc.* (N.D.Cal. 1995) 923 F.Supp. 1231; *Religious Technology Center v. Lerma* (E.D.Va. 1995) 908 F.Supp. 1362; *Religious Technology Center v. F.A.C.T.NET, Inc.* (D.Colo. 1995) 901 F.Supp. 1519.) This conclusion is also consistent with the principle that the First Amendment generally prohibits limitations, absent some extraordinary showing of governmental interest, on the publication of information already made public. (*The Florida Star v. B.J.F.* (1989) 491 U.S. 524 [105 L.Ed.2d 443, 109 S.Ct. 2603] [state could not punish publication of name of sexual offense victim lawfully acquired]; *Smith v. Daily Mail Publishing Co.* (1979) 443 U.S. 97, 103 [61 L.Ed.2d 399, 99 S.Ct. 2667] [newspapers could not be punished for publishing the name of a juvenile charged with an offense, lawfully obtained by monitoring police radio transmissions]; *Landmark Communications, Inc. v. Virginia* (1978) 435 U.S. 829 [56 L.Ed.2d 1, 98 S.Ct. 1535] [invalidating criminal sanctions against third party that published report of judicial review commission]; *Cox Broadcasting Corp. v. Cohn* (1975) 420 U.S. 469, 491 [43 L.Ed.2d 328, 95 S.Ct. 1029] [state could not forbid or punish the publication of the name of a rape victim obtained from public records].) Furthermore, Internet speech and publication are fully protected by the First Amendment. (*Reno v. ACLU* (1997) 521 U.S. 844, 870 [138 L.Ed.2d 874, 117 S.Ct. 2329].) Thus, both trade secret law and the First Amendment are in accord that information republished on the Internet after having been made public on the Internet generally cannot be sanctioned.

The trial court, in preliminarily concluding that the trade secret was not lost, stated: "Plaintiffs moved expeditiously, reasonably and responsibly to protect their proprietary information as soon as they discovered it had been disclosed by investigating, sending cease and desist letters all over the world and then filing suit against those who refused within two months of the

---

[3] I note that since the time the preliminary injunction went into effect, it appears that the DVD CCA's proprietary information has been widely distributed. According to several uncontradicted declarations attached to Bunner's motion to dismiss for mootness, filed in this court on February 7, 2003, DeCSS remains available at hundreds of locations on the Internet. Moreover, CSS and its algorithms and keys have been the subject of extensive academic research and discussion, including technical papers describing and analyzing CSS, and computer science courses in which the methods and flaws of CSS encryption are taught.

disclosure." But under Civil Code section 3426.1, subdivision (d), the question whether the information in question "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy" is separate from the question whether the information is "not . . . generally known to the public or to other persons who can obtain economic value from its disclosure or use." In order to claim the existence of the trade secret, both conditions must be present. Therefore, even when a trade secret holder acts with perfect diligence, it has no action against the republisher of no-longer-secret information who does not act in privity with the original misappropriator. (See *Religious Technology Center v. Lerma, supra,* 908 F.Supp. 1362, 1368 [information posted on the Internet for 10 to 12 days no longer a trade secret].)

That is not to say that a trade secret is automatically lost any time it is posted on the Internet. Amici curiae Intellectual Property Law Professors et alia argue, for example, that information posted on an obscure Internet site and detected quickly should not lose trade secret status. This position is consistent with case law holding that minor disclosures of a trade secret followed by a brief delay in withdrawing it from the public domain do not cause trade secret status to be lost. (*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.* (4th Cir. 1999) 174 F.3d 411, 418 [recognizing as well established that the required secrecy is relative rather than absolute]; *Gates Rubber Co. v. Bando Chemical Indus., Ltd.* (10th Cir. 1993) 9 F.3d 823, 849.) But a plaintiff carries the burden of showing that the trade secret remains a secret despite the Internet posting. In the present case, nothing in the record indicates that the DVD CCA met that burden. In fact, the trial court failed to make any particularized findings at all that the information was still secret when Bunner republished it, instead treating the 20 or so defendants as a class and making general statements that these defendants had published secret information. Without evidence in the record that the proprietary information was still secret at the time Bunner downloaded it from the Internet, the DVD CCA cannot sustain its burden of demonstrating a likelihood of prevailing on the merits.[4]

### III.

In sum, the DVD CCA has failed to establish that the information Bunner republished was still secret at the time he republished it on his Web site.[5]

---

[4] Moreover, in assessing the balance of harms, the trial court neglected to consider the harm to Bunner's First Amendment rights. (See *American Booksellers Association, Inc. v. Superior Court* (1982) 129 Cal.App.3d 197, 206 [181 Cal.Rptr. 33].)

[5] I also note that it is highly doubtful the alleged trade secret was acquired by improper means within the meaning of the trade secret law. Civil Code section 3426.1, subdivision (a), defining "improper means," states "[r]everse engineering . . . alone shall not be considered improper means." Apparently the word "alone" refers to the fact that the item reverse engineered would have to be obtained "by a fair and honest means, such as purchase of the

It is likely that the trial court's view of this case was colored by the information that DeCSS is designed to circumvent the encryption of DVD's. But the fact that the information at issue is being used for a decrypting purpose is not significant from the standpoint of trade secret law. (See *Chicago Lock Co. v. Fanberg* (9th Cir. 1982) 676 F.2d 400 [overturning trade secret injunction against publication of key codes for tubular locks by two locksmiths who acquired codes properly by reverse engineering].) It may or may not be the case that Bunner's action violated the Digital Millennium Copyright Act (DMCA) (17 U.S.C. § 1201), which explicitly prohibits various efforts to circumvent "technological measures that effectively control access" to copyrighted works (*id.*, § 1201 (a)(1)(E), (2)(A)). Unlike trade secret law, the DMCA does not inquire into whether technology-circumventing devices are acquired by improper means or are based on secret information, but rather considers whether the primary *purpose* of those devices was improper. (*Ibid.*; see *Universal City Studios, Inc. v. Corley* (2d Cir. 2001) 273 F.3d 429, 440–441.) DVD CCA's complaint did not allege a violation of the DMCA and that issue is not before us. All I would decide is that it is manifest from the record that the DVD CCA did not establish a likelihood of prevailing on its trade secret claim.

Therefore, I conclude that the trial court's preliminary injunction against Bunner was an unlawful prior restraint. Accordingly, instead of remanding to the Court of Appeal for further proceedings, I would affirm its judgment on the alternate grounds stated above.

Appellant's petition for a rehearing was denied October 15, 2003, and the opinion was modified to read as printed above. Kennard, J., Baxter, J., and Chin, J., did not participate therein.

---

item on the open market for reverse engineering to be lawful." (Legis. Com. com., 12A pt. 1 West's Ann. Civ. Code, *supra*, foll. Civ. Code, § 3426.1, p. 238, quoting Rest. Torts § 757, com. f.) According to the allegations of the complaint, the alleged initial misappropriator of CSS, Jon Johansen, acquired the secret through reverse engineering. There is no allegation that he acquired the product containing CSS unlawfully, and that therefore improper means were employed. The DVD CCA argument below that violation of a "click license" agreement prohibiting reverse engineering constituted the improper means does not appear to have merit. To be sure, contract plays an important role in trade secret law by protecting the trade secret holder against "unauthorized use or disclosure through a contract *with the recipient of a disclosure*" or others who have had special access to trade secret information, via confidentiality agreements and the like. (Rest.3d Unfair Competition, § 41, com. d, p. 471, italics added.) But nowhere has it been recognized that a party wishing to protect proprietary information may employ a consumer form contract to, in effect, change the statutory definition of "improper means" under trade secret law to include reverse engineering, so that an alleged trade secret holder may bring an action even against a nonparty to that contract. Moreover, if trade secret law did allow alleged trade secret holders to redefine "improper means" to include reverse engineering, it would likely be preempted by federal patent law, which alone grants universal protection for a limited time against the right to reverse engineer. (See *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.* (1989) 489 U.S. 141, 155 [103 L.Ed.2d 118, 109 S.Ct. 971].)