Filed 1/29/14  Shoemaker v. Gianopoulos CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| BECKY SHOEMAKER, | H038576 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. CV173740) |
| v. | |
| JOHN GIANOPOULOS, | |
| Defendant and Appellant. | |

Defendant John Gianopoulos, in propria persona, appeals from a Code of Civil Procedure section 527.6 civil harassment restraining order issued upon the petition of Becky Shoemaker, which prohibits him from harassing Ms. Shoemaker for a period of three years.  Much of Mr. Gianopoulos's opening brief is devoid of any record references.[1]  The most we can derive from the brief is that he attacks the credibility of

---

[1]  We deny Ms. Shoemaker's request to strike significant portions of Mr. Gianopoulos's opening brief and reply brief on the basis that Mr. Gianopoulos makes factual assertions without citation to the record in violation of California Rules of Court, rule 8.204(a)(1)(C).  When an appellate brief contains references to matters not supported by the record on appeal, we can simply ignore these references rather than strike them. (Cal. Rules of Court, rule 8.204(e)(2)(C); *Connecticut Indemnity Co. v. Superior Court* (2000) 23 Cal.4th 807, 813, fn. 2.)  Ignoring these references we will address Mr. Gianopoulos's issues.  Further, we deny Mr. Gianopoulos's motion for sanctions against Ms. Shoemaker and her attorney Benjamin Ikuta.  In essence, Mr. Gianopoulos is claiming that Mr. Ikuta and Ms. Shoemaker made false claims to obtain the restraining

Ms. Shoemaker and others, as it pertains to a medical malpractice lawsuit (hereafter the underlying lawsuit) that he filed against Radiology Medical Group (RMG) at some point in time; in addition he attacks the factual assertions that Ms. Shoemaker made in her request for a restraining order and her testimony at the hearing on her request for a restraining order. We point out that it is for the trial court to determine credibility. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266.) Credibility is an issue for the fact finder, and as such, we do not reweigh evidence or reassess the credibility of witnesses. (*Cowan v. Krayzman* (2011) 196 Cal.App.4th 907, 915.) "Conflicts in the evidence, conflicting interpretations thereof and conflicting inferences which reasonably may be drawn therefrom, present issues of fact for determination by the trier of fact who 'is the sole judge of the credibility of the witnesses'. . . ." (*Church of Merciful Saviour v. Volunteers of America, Inc.* (1960) 184 Cal.App.2d 851, 856–857.) Our task is merely to determine whether the judgment in this case is supported by substantial evidence (*Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1137–1138), whether the facts are legally sufficient to constitute civil harassment under section 527.6,[2] and whether the restraining order passes constitutional muster. (*DVD Copy Control Ass'n v. Bunner* (2003) 31 Cal.4th 864, 890.)

*Background*

*Restraining Order Petition and Allegations*

Ms. Shoemaker sought a civil harassment restraining order for herself, members of her family and several of her coworkers. Ms. Shoemaker alleged that the harassment she had suffered was "a result of a combination" of her familial relationship with Mr.

---

order. An appellate court may impose sanctions where a party or attorney included in the record any matter not reasonably material to the *appeal's determination*; filed a frivolous motion; or committed any other unreasonable violation of the California Rules of Court. (Cal. Rules of Court, rule 8.276(a)(2)-(4), italics added.) Mr. Gianopoulos's motion for sanctions is directed at what went on in the lower court, not what is happening on appeal.

[2] All unspecified section references are to the Code of Civil Procedure.

2

Gianopoulos and well as her employment at RMG.[3] Ms. Shoemaker explained that on June 22, 2006, Mr. Gianopoulos had filed a complaint in Santa Cruz County Superior Court, case number CV 169200 against RMG; that in the complaint, Mr. Gianopoulos had alleged that in December 2005, the radiologist and technician on duty at RMG had injected him with a contrast dye solution during an MRI procedure; that as a result of the contrast, Mr. Gianopoulos alleged he had suffered an allergic reaction; that a two week jury trial commenced in February 2008; that Jennafer Gianopoulos[4] testified on behalf of Mr. Gianopoulos; that at trial Jennafer Gianopoulos had disclosed private and personal information surrounding her employment and termination from RMG; that after a two week jury trial in February 2008, the jury awarded a defense verdict in favor of RMG and after RMG filed a memorandum of costs was awarded $28,929.94 as the prevailing party; that her father was disgusted by Mr. Gianopoulos at trial and by the personal information that Jennafer Gianopoulos had disclosed on the witness stand and as a consequence had written the entire Gianopoulos family out of his will and trust; that the harassment she had endured was a result of Mr. Gianopoulos's anger toward his family being written out of her father's will and trust and was an attempt by Mr. Gianopoulos to have her fired from her employment with RMG and an attempt to hurt RMG financially.

Ms. Shoemaker described the harassment as Mr. Gianopoulos creating various websites on which he had stated that she was "Guilty of perjury, conspiracy and intentionally violating laws made to protect patients"; that online he had posted photographs of her house and posted her personal telephone number, address and her personal email account; that on his website www.liarliarliar.com he had accused her of

---

[3]     Ms. Shoemaker stated that she was related to Mr. Gianopoulos through marriage and described Mr. Gianopoulos as her "stepsister's ex-husband's twin brother." Ms. Shoemaker explained that her birth father was married to her step-sister's mother.

[4]     According to Ms. Shoemaker, Jennafer Gianopoulos is her step-sister's daughter and also Mr. Gianopoulos's niece; and she had been employed as a receptionist at RMG.

being involved in many illegal and unethical activities and inferred that she had engaged in sexual acts and "other 'acts of perversion' " with RMG employees and RMG attorneys; that Mr. Gianopoulos had put a sign on a residence approximately one mile away from RMG on the lawn of a home occupied by an RMG employee that stated:

"Press Release:  Dominican MRI Center/Radiology Medical

Group Acts of Perversion

Acts of Perversion

Felony Conspiracy

Criminal Extortion"

Ms. Shoemaker alleged that the sign had a link to Mr. Gianopoulos's website www.radiologyofsantacruz.com.

In addition to the foregoing, Ms. Shoemaker alleged that Mr. Gianopoulos had started to park his vehicle in the RMG parking lot.  On the vehicle were references to his websites www.liarliarliar.com and wwwdominicanmricenter.com, as well as a sign that stated:

"Conspiracy, Fraud & Liars

Criminals

John Rider

Dr. Spellman

Linda Lantry

Becky Shoemaker"

Furthermore, multiple times a week Mr. Gianopolous had posted things on Craigslist that named her, as well as other employees of RMG; according to Ms. Shoemaker, these postings made disparaging, dishonest, and harassing comments about her and the RMG employees.  Specifically, Ms. Shoemaker alleged that on March 23, 2012, Mr. Gianopoulos posted on the Sacramento Craigslist "RMG Manager Becky Shoemaker guilty of deviant acts . . . .  [¶]  Santa Cruz Comprehensive Imaging/Radiology Medical

4

Group Manager Becky Shoemaker intentionally violated several laws made to protect patients.  [¶]  I did not want my personal medical information being told to whomever Becky Shoemaker saw fit to tell.  She conspired to cover up an intentional act of battery and lied about her involvement and the involvement of her coworkers."  Ms. Shoemaker claimed that similar disparaging remarks were made on various other websites, as well as posted in advertisements in the local newspapers; the postings accused her of engaging in deviant sexual acts, of committing perjury in court and of blackmailing other RMG employees into lying in court.  According to Ms. Shoemaker, repeatedly, the posts stated that she had been convicted of numerous criminal acts.

Finally, Ms. Shoemaker alleged that Mr. Gianopoulos had set up a telephone number and had notified Yellow Pages as well as 411.com and other listing websites that RMG was associated with the number.  She alleged the recorded message stated that caller had reached "Radiology of Santa Cruz"; and that an investigation into RMG and Dominican MRI center had found, among other things, "criminal acts of perversion against a patient."

*Answer to Request to Stop Harassment*

Mr. Gianopoulos filed an answer to Ms. Shoemaker's request for a restraining order.  In essence, he stated that the allegations were untrue and that Ms. Shoemaker had lied.  The place where the sign was posted was his property; and he had not parked his vehicle in the RMG lot for "at least 5 years."  Mr. Gianopoulos attached a 21-page document in which he made allegations that Ms. Shoemaker and RMG were harassing him in order to force him to take down websites and comments about their criminal activity.  Mr. Gianopoulos detailed his version of the facts underlying his lawsuit against RMG.  In sum, he claimed to have posted true comments about individuals that had directly or indirectly committed criminal acts against him about which he felt that the public had a right to be informed.

*Civil Harassment Petition Hearing and Order*

At the hearing on Ms. Shoemaker's petition, Ms. Shoemaker was extensively cross examined by Mr. Gianopoulos's attorney concerning her allegations and supporting documentation. At one point in the hearing, defendant's counsel asked Ms. Shoemaker about an allegation she made that defendant notified the "yellow pages" as well as "411.com" and other listing websites that RMG was associated with a particular telephone number. The court asked for the telephone number and had it dialed by the courtroom clerk. The court reporter took down the content of the message as follows: "Hello, you have reached Radiology of Santa Cruz. Our ongoing investigation has found Radiology Medical Group of Santa Cruz County, Dominican MRI Center, also known as RMG, guilty of criminal acts of perversion against a patient. Some of this deviant behavior was performed at the facility owned by RMG which includes Dominican MRI Center, Dominican Breast Center, Santa Cruz Comprehensive Imaging, and South County Imaging. At least one patient was permanently injured when MRI technician John Rider illegally injected a patient with contrast dye. Technician Rider ignored both the patient's direct written order and the patient's doctor's written referral not to inject this contrast. This injection of contrast immediately caused the patient to go into anaphylactic shock. Without regard to the patient or the law, no physician (inaudible) doing the injection as required by law. [¶] Doctor Michael Stone, a radiologist and shareholder of Radiology Medical Group (inaudible) RMG manager, Becky Shoemaker, and staff members, (inaudible) to alter the patient's medical records in an attempt to hide their illegal and unethical acts. [¶] For more details of Dominican MRI Center and Radiology Medical Group's illegal activity, you may wish to visit the website www.radiologyofsantacruz.com and www.liarliarliar.com. Thank you."

After listening to the message, the court ordered that Mr. Gianopoulos disable the telephone number and the message. The court found it "entirely inappropriate" as it was

6

"a fraudulent message" that "purports to state" that it is "a message that is given by Radiology Medical Group."  The court reasoned that the message was "fraudulent" and ordered Mr. Gianopoulos to "disable it."

Mr. Gianopoulos's counsel asked Ms. Shoemaker about a photograph of Mr. Gianopoulos's vehicle that she alleged Mr. Gianopoulos had parked in the RMG parking lot; according to Mr. Gianopoulos's counsel the vehicle has www.liarliarliar.com on the windshield.  On redirect, Ms. Shoemaker's counsel asked her to look at the photograph and read all of what was on the windows of the vehicle.  Ms. Shoemaker stated the following: "www.liarliarliar.com, www.dominicanmricenter.com, again, www.liarliarliar.com.  It's two more times; that's on the back.  On the side it says: Unsafe Medical Care, www.dominicanmricenter.com, www.liarliarliar.com, conspiracy, fraud and liars, criminals, John Rider, Dr. Spillman, Linda Lantree, Becky Shoemaker.  That's on the right side of the vehicle."

After Ms. Shoemaker finished testifying, the court allowed Mr. Gianopoulos to testify "for the purpose of his explaining" to the court "what legitimate purpose he has in consolidating and publishing Ms. Shoemaker and her family members' personal information on his website, what legitimate purpose he has in posting photographs of her house on his website, what constitutional rights he alleges authorize him to misrepresent his phone number as an RMG phone number and contain a voicemail message ascribing these bad acts and conduct to employees of RMG, and what legitimate purpose he has in describing Ms. Shoemaker as a criminal being guilty of acts of perversion, engaging in . . . deviant acts."

Mr. Gianopoulos testified that he had never attempted to contact Ms. Shoemaker and the personal information he got about Ms. Shoemaker he got from doing a search on the internet and posted it because the "public should know what they're doing."  Mr. Gianopoulos denied posting anything personal about Ms. Shoemaker, he reiterated that it was information he found on the internet.  When the court asked why he had put Ms.

7

Shoemaker's telephone number and her address and her email on his website, Mr. Gianopoulos responded, "There is no specific purpose. I just put it on, just the same thing I did with the attorneys." Mr. Gianopoulos could not give an explanation of why he posted a photograph on Ms. Shoemaker's house on his website.

Defendant stated that everything he said about RMG and the criminal activity meaning perjury, conspiracy, fraud, and illegal injection of contrast, was true. Mr. Gianopoulos said that he had put a description of what perversion and deviant behavior mean on his website. He denied that he ever stated that Ms. Shoemaker was involved in any sexual perversion with any attorneys or employees. Mr. Gianopoulos admitted that he owned a business called Radiology of Santa Cruz that has a telephone number;[5] he admitted that on the telephone message he talks about the criminal activity of RMG. However, he denied that he contacted the yellow pages and 411.com to link his accounts with RMG. Mr. Gianopoulos claimed that he was not harassing Ms. Shoemaker, rather he was exercising his constitutionally protected right to free speech.

On cross examination, Mr. Gianopoulos admitted that he owned the websites www.liarliarliar.com and www.dominicanmricriminalactivity.com and www.dominicanmricenter.com. He said he named them appropriately "because of the activity that they perpetrated against" him. When asked if he owned the website www.radiologyofsantacruz.com, Mr. Gianopoulos responded affirmatively; he explained that he named it that so "the people that wanted to research things on the Internet would come up to my site and see what Radiology Medical Group's criminal activities are." Counsel for Ms. Shoemaker showed Mr. Gianopoulos a document printed out from this website; counsel asked Mr. Gianopoulos to read what was on the posting after he confirmed that he had written it. The posting read, "10-26-11 -- It has been brought to

---

[5]     Later, Mr. Gianopoulos confirmed that the telephone number the court had dialed was the number created for his business.

8

my attention some people may believe the acts of perversion of Radiology Medical Group RMG, employees (Dr. Michael Spillman, MRI technician John Rider, manager Becky Shoemaker) and attorney Barry Marsh are involved in is sexual in nature. The facts I am presenting are not due to any sexually perverse or sexually deviant acts they may be involved in. I cannot make any statements as to their sexual preferences, only their proven illegal activities." Mr. Gianopoulos said the purpose of putting this on the website was because friends had said that people may have taken the references to perversion and deviant behavior as something of a sexual nature and he wanted to make clear that was not what he meant, he did not want to mislead people. Mr. Gianopoulos denied that he wanted to associate Ms. Shoemaker's name with sexual perversion in a Google search.

Counsel for Mr. Gianopoulos argued to the court that Mr. Gianopoulos's course of conduct was "in the realm of personal speech, not commercial speech." Counsel pointed out that "[p]ersonal speech is subject to the strictest test of speech as distinct from commercial speech. And it is the government intervening on chilling a person's free speech rights that requires a legitimate government interest, not the speaker who is expressing himself, I believe in a legitimately protected area of consumer rights, most particularly in an environment of monopoly, control of local market radiology services, as well as the fact that it pertains to medical care of the citizens in our fairly small and isolated community." Counsel pointed out that no one had asked Mr. Gianopoulos to stop what he was doing and there was no evidence that he was out of control. Counsel explained to the court that he had looked up the words "perversion, "pervert" and "deviant" and the "number one definition of deviant is departing from the norm"; and the "[n]umber one definition of perversion is the alteration of something from its original course, meaning or state to (inaudible) others corruption from what was first intended. [¶] And Mr. Ginaopoulos'[s] view is that he believes that the defendants perverted from

9

the ordinary, distorted from the norm, the legal processes by Ms. Shoemaker and the other defendants in the malpractice case, modifying medical records . . . ."

At the end of the hearing, the court gave a tentative ruling that an injunction would issue and asked Ms. Shoemaker's counsel to prepare a proposed order. The court set a hearing for the purpose of crafting the final order. Subsequently, at the next hearing the court expressed concern as to whether Mr. Gianopoulos's harassment "occurred within the meaning of [section] 527.6 [subdivision] (b)(3) by making harassing telephone calls to the individual or sending harassing correspondence to an individual, by means including, but not limited to, the use of public or private mails, interoffice mail, fax or computer e-email. [¶] And so the question I have is if someone publishes something in the public domain, creating a website or creating a pre-recorded tape voicemail message then it gets mailed to the Plaintiff, that isn't done by way of telephone call or communicating directly to the Plaintiff. [¶] My concern is . . . that all the reported cases that I'm familiar with involve a direct communication and a repeated course of direct communications to the Plaintiff as opposed to creating some publication which the Plaintiff has to go to herself and look up in some other location in order to find the harassing material."[6]

After listening to argument from both Mr. Gianopoulos's counsel and Ms. Shoemaker's counsel the court set a briefing schedule to address the issue of "whether the methodology by which [Mr. Gianopoulos] engaged in this conduct is covered by the statute."[7] The court did inform Ms. Shoemaker's counsel that he would give counsel

---

[6]     The court stated for the record that there was "no evidence that Mr. Gianopoulos engaged in unlawful violence. There is no evidence he made credible threats of violence." Further, the court found that there was no evidence Mr. Gianopoulos "phoned her directly, that he mailed anything to her directly." Rather, in the court's view what "he did was made these harassing, in my view, unprotected accusations and statements that did harass her and would harass a reasonable person . . . ."

[7]     The court asked counsel to address one more legal issue. Specifically, whether, in light of the conclusion that there was no credible threat of violence by Mr. Gianopoulos,

10

"[p]retty much everything" he had asked for as long as the court was "persuaded that it's covered by the statute, given that you are conceding that there is no evidence that he phoned her, he e-mailed her, he mailed her directly, he delivered any materials to her place of business, of employment, he delivered any of these materials to her home. And instead, they were in the ether on an internet site, which she had to access herself in order to see the harassing material."

Mr. Gianopoulos's counsel informed the court that Mr. Gianopoulos had voluntarily taken off the recorded telephone message the court had listened to, including any reference to Ms. Shoemaker that was in the message.

Ultimately, in a lengthy written order filed on May 29, 2012, the court granted the injunction. The court found that Mr. Gianopoulos had engaged in acts of harassment against Ms. Shoemaker within the meaning of section 527.6, subdivision (b)(3); and that the "harassment consisted of a knowing and willful course of conduct directed at Plaintiff that has seriously alarmed, annoyed and harassed her." The court found that "despite [Mr. Gianopoulos]'s claims that he was merely exercising his free speech rights, his conduct served no legitimate purpose." Accordingly, the court ordered Mr. Gianopoulos to remove his three websites—www.radiologyofsantacruz.com, www.dominicanMRIcenter.com, and www.santacruzradiology.com—in their entirety; remove from "any and all websites he created on the Internet" all "references to and refrain from posting" Becky Shoemaker's, Amy Shoemaker's and Steven Shoemaker's "address, telephone numbers, email addresses, and any photographs of their residence" as well as "remove all [existing] references to and refrain from posting that Becky Shoemaker is a 'deviant,' is a 'pervert,' has engaged in 'acts of perversion,' or engaged in 'perverted activity,' " or "has engaged in any criminal activity" or "sexual misconduct."

the court could delete from the order the prohibition against ownership or possession of firearms, since the Mr. Gianopoulos had "a legitimate need for possession of a firearm, given the nature of his business."

11

The court permitted Mr. Gianopoulos to maintain www.liarliarliar.com and www.dominicanmricriminalactivity.com, subject to the aforementioned limitations. However, Mr. Gianopoulos was ordered to remove the voicemail message on the number (831) 464-3664 and refrain from impersonating RMG or any RMG employee or agent in any voicemail recording. The court ordered Mr. Gianopoulos to stay 100 yards away from Ms. Shoemaker's residence, and places of employment on Soquel Drive, however the order did not prevent him from traveling on Soquel Drive, as long as he did not park within 100 yards of Ms. Shoemaker's place of employment. Mr. Gianopoulos was ordered to refrain from contacting Ms. Shoemaker and her family members directly or indirectly, "including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means."[8] The court imposed the order for three years.

*Discussion*

Section 527.6, subdivision (a)(1), provides, "A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an injunction prohibiting harassment as provided in this section." Section 527.6, subdivision (b)(3) provides: " 'Harassment' is unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." A course of conduct is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, *including following or*

---

[8]     The court stated that Code of Civil Procedure section 527.6, subdivision (t), which would have restricted Mr. Gianopoulos from owning, possessing, purchasing, receiving, or attempting to purchase or receive a firearm or ammunition while the protective order was in effect, "would not apply" to the order.

12

*stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, fax, or computer e-mail.* Constitutionally protected activity is not included within the meaning of 'course of conduct.' " (§ 527.6, subd. (b)(1), italics added.)

Section 527.6, subdivision (b)(6) states: " 'Temporary restraining order' and 'injunction' mean orders that include any of the following restraining orders, whether issued ex parte or after notice and hearing: [¶] (A) An order enjoining a party from harassing, intimidating, molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, abusing, telephoning, including, but not limited to, making annoying telephone calls, as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, or coming within a specified distance of, or disturbing the peace of, the petitioner. [¶] (B) An order enjoining a party from specified behavior that the court determines is necessary to effectuate orders described in subparagraph (A)."

On appeal, as noted, the appropriate test is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record. (*Bookout v. Nielsen*, *supra*, 155 Cal.App.4th 1131, 1137–1138, [injunctions under section 527.6 are reviewed to determine whether factual findings are supported by substantial evidence; trial court's determination of controverted facts will not be disturbed on appeal].) "Under the substantial evidence standard of review, 'we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment.' " (*ASP Properties*

*Group, L.P. v. Fard, Inc., supra,* 133 Cal.App.4th at p. 1266.) However, whether the facts, when construed most favorably in Ms. Shoemaker's favor, are legally sufficient to constitute civil harassment under section 527.6, and whether the restraining order passes constitutional muster, are questions of law subject to de novo review. (*DVD Copy Control Ass'n v. Bunner, supra,* 31 Cal.4th 864, 890, [reviewing court independently examines whether facts come within First Amendment]; *Smith v. Selma Comm. Hosp.* (2008) 164 Cal.App.4th 1478, 1515 [existence or nonexistence of substantial evidence is question of law].)

"Section 527.6 was enacted 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' [Citations.] It does so by providing expedited injunctive relief to victims of harassment. [Citation.]" (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412.) The purpose of an injunction under section 527.6 is not to punish for past acts of harassment, but rather to provide quick relief and prevent future harassment. (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 403.) An injunction restraining future conduct is authorized under section 527.6 only when it appears from the evidence that the harassment is likely to recur in the future. (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 189.) In evaluating the likelihood that the harassment will continue, the court may consider the totality of the circumstances, "including evidence of conduct that might not itself constitute harassment." (*Id.* at pp. 189–190.)

We are satisfied there was substantial evidence of the conduct that Ms. Shoemaker alleged Mr. Gianopoulos engaged in; Ms. Gianopoulos admitted that he had posted most of the things that Ms. Shoemaker alleged constituted the harassment. However, having determined the acts occurred, there is a separate legal question of whether the facts, as found by the trial court, are *legally* sufficient to constitute civil harassment under section 527.6, and whether the restraining order is constitutional. These determinations are subject to a de novo standard of review. (*R.D. v. P.M., supra,* 202 Cal.App.4th at p. 188.) Similar to the lower court, our concern is whether the course of conduct Mr. Gianopoulos

14

engaged in is legally sufficient to constitute civil harassment under section 527.6 given that there was no evidence that Mr. Gianopoulos telephoned, emailed, or mailed anything directly or indirectly to Ms. Shoemaker at her place of business or her home, or tried to contact Ms. Shoemaker in person; rather Mr. Gianopoulos posted things about Ms. Shoemaker and the underlying lawsuit on the internet and on his vehicle and a sign that he displayed in the front yard of a piece of property.

Ms. Shoemaker argues that a harassing course of conduct does not require that the harasser communicate solely toward the individual as long as it comprises a series of acts that seriously alarm, annoy, or harass the person, and that serves no legitimate purpose under sections 527.6, subdivisions (b)(1) and (3). In support of this position, Ms. Shoemaker cites to *Brekke v. Wills*, *supra*, 125 Cal.App.4th 1400 (*Brekke*).

In *Brekke, supra,* 125 Cal.App.4th 1400, the Third District Court of Appeal addressed the requirements for an actionable course of conduct under section 527.6. In that case, the plaintiff's 16–year–old daughter, Danielle, began dating the defendant and soon thereafter Danielle's school performance suffered and her relationship with her parents deteriorated. The plaintiff told her daughter the relationship with the defendant must end. Thereafter, the defendant called the plaintiff and she attempted to explain why she was concerned about his relationship with her daughter. However, the defendant " 'argued every point' " and would not listen to what she had to say. He also laughed and cussed at her. The plaintiff became frustrated and ended the conversation. When the plaintiff began fearing Danielle was using drugs, she searched Danielle's room and found letters to Danielle from the defendant that she considered disturbing. Some contained instructions on how Danielle might retaliate against the plaintiff. (*Id.* at p. 1405.)

Knowing the plaintiff had been searching Danielle's room, the defendant gave Danielle three letters to plant in the room with the expectation that the plaintiff would read them. In one letter, the defendant described a plan to provoke the plaintiff or her husband into physically attacking him and then suing them for money. The letter also

15

directed the plaintiff to turn to page eight, which was a separate letter to the plaintiff containing highly abusive language and expressing the defendant's belief in the futility of trying to keep him and Danielle apart. (*Brekke, supra*, 125 Cal.App.4th at pp. 1405–1407.) In the third letter, the defendant set forth a "fantastical scheme of torture-murder" involving rabid dogs whereby he and Danielle could kill her parents. (*Id.* at p. 1407.)

After reading the three letters, the plaintiff sought a temporary restraining order and injunction against the defendant pursuant to section 527.6. (*Brekke, supra*, 125 Cal.App.4th at p. 1407.) The trial court issued the requested injunction. (*Id.* at p. 1408.)

On appeal, the defendant argued, among other things, that there was insufficient evidence of a course of conduct sufficient to satisfy the requirement of section 527.6. The Court of Appeal rejected that argument, finding sufficient evidence of a course of conduct from the three threatening letters, the earlier letters written to Danielle instructing her on how to retaliate against her parents, and the taunting telephone conversation between the plaintiff and the defendant. (*Brekke, supra*, 125 Cal.App.4th at p. 1413.) The Court of Appeal explained: "It is readily apparent from the tone and content of his letters and telephone call that defendant had no intention of ceasing his behavior toward plaintiff. Thus, we have no trouble concluding that all of his actions constituted a course of conduct, i.e., 'a series of acts over a period of time, however short, evidencing a continuity of purpose . . . .' " (*Id.* at pp. 1413–1414.)

Ms. Shoemaker argues that *Brekke* illustrates that correspondence or conduct does not have to be addressed to a person to be "directed" at that person. Ms. Shoemaker is missing the point. The question is whether Mr. Gianopolous's course of conduct of posting disparaging remarks about Ms. Shoemaker falls within section 527.6, subdivision (b).

Ms. Shoemaker argues that although section 527.6, subdivision (b)(1) provides three examples of harassing courses of conduct—stalking, telephone calls to an individual, and correspondence to an individual—the word "including" as used in this

16

section is ordinarily a term of enlargement rather than a limitation.  We do not disagree.
Certainly, " 'the statutory definition of a thing as "including" certain things does not
necessarily place thereon a meaning limited to the inclusions.' "  (*Flanagan v. Flanagan*
(2002) 27 Cal.4th 766, 774.)  However, here we are guided by the doctrine of *ejusdem
generis* in determining whether the course of conduct that Mr. Gianopoulos engaged in is
"included" within section 527.6, subdivision (b)(1).

"[T]he doctrine of *ejusdem generis* [also known as Lord Tenterden's rule] . . .
states that where general words follow the enumeration of particular classes of persons or
things, the general words will be construed as applicable only to persons or things of the
same general nature or class as those enumerated.  The rule is based on the obvious
reason that if the Legislature had intended the general words to be used in their
unrestricted sense, it would not have mentioned the particular things or classes of things
which would in that event become mere surplusage."  (*Scally v. Pacific Gas & Electric
Co.* (1972) 23 Cal.App.3d 806, 819; see Civ. Code, § 3534 [particular expressions qualify
those which are general]; *Matter of Petition of Johnson* (1914) 167 Cal. 142.)  The
doctrine of *ejusdem generis* seeks to ascertain common characteristics among things of
the same kind, class, or nature when they are cataloged in legislative enactments.
(*Lawrence v. Walzer & Gabrielson* (1989) 207 Cal.App.3d 1501, 1506; *Martin v.
Holiday Inns, Inc.* (1988) 199 Cal.App.3d 1434, 1437 (*Holiday Inns, Inc.*)  *Ejusdem
generis* is illustrative of the more general legal maxim *nocitur a sociis*—"it is known
from its associates."  (*Holiday Inns, Inc.*, *supra*, 199 Cal.App.3d at p. 1437.)

Applying the *ejusdem generis* maxim, the conduct found here, without more, is
simply not similar to the examples listed in the statute; the examples listed in the statute
have one thing in common—they all consist of directly contacting a particular person.
Since the conduct found here is not similar to the examples listed in the statute, it cannot
be included in the definition of "course of conduct."

17

The case of *R.D. v. P.M., supra,* 202 Cal.App.4th 181 (*R.D.*) is instructive. In that case, the course of conduct that was found to come within the statute included the defendant, a former patient of the plaintiff therapist, confronting the plaintiff at a local market, posting negative consumer reviews on the internet and distributing flyers at the plaintiff's office on nine occasions over a period of seven days and at the school plaintiff's son attended with disparaging messages about the plaintiff, and engaging in volunteer activities at the school plaintiff's children attended. (*Id.* at pp. 183, 189.) The Second District Court of Appeal concluded that the evidence showed that "P.M. had come to the market at which R.D. regularly shopped in order to confront R.D. in a threatening manner; that she had come to R.D.'s son's school to distribute flyers in order to continue her harassment and stalking of R.D. and her family; and that she had on many occasions come in and around R.D.'s office building in a successful effort to alarm R.D. and to put her in fear for her safety." (*Id.* at p. 189.)

The restraining order in *R.D.* required P.M. to stay at least 100 yards away from R.D. and members of her immediate family, their home, workplaces, vehicles, and schools. It specified acts of personal conduct that P.M. was to refrain from doing to R.D. or to members of her immediate family, including harassing, attacking, threatening, assaulting, or stalking them, destroying their personal property, keeping them under surveillance, or blocking their movements. (*R.D., supra*, at p. 187.) On appeal, P.M contended that the order impermissibly infringed her constitutional freedom of speech rights, because her distribution of flyers about R.D. addressed a matter of public concern, and because the order constituted an overbroad content-based prior restraint that burdened her speech more than is necessary to prevent the harassment. (*Id.* at p. 191.) The Court of Appeal concluded, "To the extent the order limits P.M.'s speech, it does so without reference to the content of her speech. The restraining order does not prevent P.M. from expressing her opinions about R.D. in any one of many different ways; she is merely prohibited from expressing her message in close proximity to R.D. and her

18

family.  [¶]  The order does not mention or explicitly prohibit P.M. from engaging in any particular form of speech with respect to R.D.—including the sorts of speech about which R.D. had complained in her restraining order requests.  It does not mention or prohibit P.M. from making statements on any subject or of any content, as long as she does so at a distance, and the statements' contents do not constitute illegal harassment within the meaning of section 527.6.  It does not prohibit P.M. from contacting R.D.'s licensing agency, from distributing flyers about R.D., or from posting derogatory criticisms of R.D. on internet sites.  It only restrains P.M. from doing those acts (or any others) within 100 yards of R.D. and members of her immediate family, their home, workplaces, vehicles, and schools."  (*Ibid.*)  The Court of Appeal recognized that the trial court "was careful to disclaim any reliance on either the truth or falsity of P.M.'s disparaging messages, or the contents of her internet postings, which it recognized to be constitutionally protected." (*Ibid.*, fn. 10.)  Thus, implicitly, the *R.D.* court recognized that posting disparaging comments about people on internet sites is constitutionally protected activity.[9]

We are mindful that the injunction imposed in this case poses a danger that permanent injunctive relief does not:  that is that potentially protected speech was enjoined prior to an adjudication on the merits of the Mr. Gianopoulos's First Amendment claims.  A judicial injunction, such as the one imposed here that prohibits speech prior to a determination that the speech is unprotected constitutes a prior restraint on that speech.  (*See Near v. Minnesota* (1931) 283 U.S. 697.)  Any system of prior restraints of speech comes to this court bearing a heavy presumption against its constitutional validity.  (*Southeastern Promotions, Ltd. v. Conrad* (1975) 420 U.S. 546, 558; *Bantam Books, Inc. v. Sullivan* (1963) 372 U.S. 58, 70; *New York Times Co. v.*

---

[9]     That is not to say that Ms. Shoemaker could not bring a defamation action or other tort action, including invasion of privacy, or intentional infliction of emotional distress against Mr. Gianopolous.

*United States* (1971) 403 U.S. 713, 714; *Organization for a Better Austin v. Keefe* (1971) 402 U.S. 415, 419.)

This case involves an injunction issued prior to "a final adjudication on the merits that the speech is unprotected." Hence, the danger posed by prior restraint is present in this case. Certainly, valid time, place and manner restrictions which do not functionally prohibit all means of communication are not prior restraints" (see, e.g., *Poulos v. New Hampshire* (1953) 345 U.S. 395, 408; *Cox v. New Hampshire* (1941) 312 U.S. 569, 574-576; cf. *Organization for a Better Austin v. Keefe*, *supra*, 402 U.S. at pp. 418-419), such as the one imposed in *R.D.*, *supra*, at page 187. The injunction in this case, however, is subject-matter censorship—entirely prohibiting Mr. Gianopoulos from publishing a particular type of information related to Ms. Shoemaker and the underlying medical malpractice case. Therefore, it poses the precise danger of prior restraint identified in *Pittsburgh Press Co. v. The Pittsburgh Commission on Human Relations* (1973) 413 U.S. 376 (*Pittsburgh Press Co.*); that is, "the special vice . . . that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." (*Id*. at p. 390.) Further, as the United States Supreme Court pointed out in *Snyder v. Phelps* (2011) 562 U.S. __ [131 S.Ct. 1207] (*Snyder*), "speech cannot be restricted simply because it is upsetting or arouses contempt. 'If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.' [Citation.] Indeed, 'the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.' [Citation.]" (*Id*. at p. 1219.)

Furthermore, "[i]n most circumstances, 'the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, . . . the burden normally falls upon the viewer to avoid further bombardment of [his] [or her]

20

sensibilities simply by averting [his] [or her] eyes.'  [Citation.]  As a result, '[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.'  [Citation.]"  (*Snyder*, *supra*, at p. 1220.)

Mr. Gianopoulos believes that Ms. Shoemaker has something to do with a conspiracy to cover up medical malpractice.  His speech is certainly hurtful and its contribution to public discourse may be insignificant.  However, it is quite apparent that he believes that he is addressing a matter of public concern—a conspiracy to cover up medical malpractice in the health care industry.  As such, unless or until his First Amendment claims are *fully adjudicated* and determined to not be protected, and he communicates his tirade directly to Ms. Shoemaker, an injunction such as the order filed on May 29, 2012, in this case cannot lie.

### *Disposition*

The order filed May 29, 2012, is reversed.  In the interests of justice, each party shall bear their own costs on appeal.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.